[No. 41420-8-I.   Division One.   February 8, 1999.]
WILLIAM J. HETZEL, *Appellant*, v. EDWARD L. PARKS, ET AL., *Respondents*.

930

*Robert B. Gould* of *Law Offices of Robert B. Gould,* for appellant.

*Dennis M. Brouner* of *Brouner & Associates, P.S.C.,* for respondents.

BECKER, J. — The question presented in this appeal is whether an attorney, by depositing into his trust account insurance settlement funds belonging to the client of another attorney, owes the other attorney's client a duty of care actionable in a suit for legal malpractice. We hold that a duty does arise in these circumstances in view of the protective purposes of a trust account, and reverse the order of dismissal entered below.

■ ■ William Hetzel's suit was dismissed by the trial court for failure to state a claim on which relief could be granted, a remedy under CR 12(b)(6). Appellate review is de novo.[1] An action may be dismissed for failure to state a claim only if it appears beyond doubt that the plaintiff can prove no set of facts, consistent with the complaint, which would entitle the plaintiff to relief. For purposes of such an analysis, the plaintiff's factual allegations are presumed to be true.[2]

According to the allegations in his complaint, Hetzel

---

[1] *Reid v. Pierce County,* 136 Wn.2d 195, 200-01, 961 P.2d 333 (1998).

[2] *Stangland v. Brock,* 109 Wn.2d 675, 677, 747 P.2d 464 (1987).

retained attorney Edward Parks to represent him in a claim for injuries arising from an automobile accident in 1995, in which Hetzel incurred substantial medical expenses. The insurer of the at-fault driver agreed to settle the case for the policy limits of $25,000. The insurer sent Parks a draft for that amount, payable jointly to Hetzel and Parks. In February, 1996, shortly after receiving the draft, Parks came to Hetzel's house and obtained his signature on the draft. Parks told Hetzel that he would make sure the bills were paid from the proceeds and that Hetzel would then get the net balance.

Parks had offices at the same business address as attorney Dennis Brouner. Parks took the draft to Brouner. Brouner says that Hetzel accompanied Parks, but Hetzel says Parks went by himself. For purposes of this analysis, we presume that Hetzel neither knew about nor authorized Parks' conversation with Brouner, and that Hetzel and Brouner never met or talked. According to Brouner's declaration below, Parks was looking for an expedited way to cash the draft. Brouner said he could assist because "my relationship with my bank was such that they would credit my account on deposit." Parks endorsed the draft for deposit into Brouner's trust account. That same day after depositing the draft, Brouner issued a check from his trust account payable solely to Parks. The check bore the notation, "for Dist. Ed Parks and/or William Hetzel." Parks immediately cashed the check. It cleared the bank the next day.

Parks did not use the cash on behalf of Hetzel. In June, Hetzel asked Parks why his bills had not been paid and why he had received none of the balance. Parks said he had invested the money in a banking venture. Hetzel filed suit against Parks. When Parks failed to respond to the complaint, Hetzel obtained a default judgment against him.

Meanwhile, Hetzel found out that the funds had gone through Brouner's trust account. In July 1996, he demanded an accounting from Brouner. Brouner did not provide one. Hetzel amended his complaint in September

1996 to add Brouner as a defendant, alleging that Brouner's involvement with the draft constituted legal malpractice and breach of a fiduciary duty.

A jury trial was set for September 15, 1997. Hetzel arranged for expert witness Leland Ripley to testify as to the standard of care. Brouner brought a motion in limine under *Hizey v. Carpenter*[3] to prevent Ripley from testifying that the Rules of Professional Conduct were the source of any duty owed by Brouner. After hearing the proffered testimony, the trial court dismissed Hetzel's suit for failure to state a claim on which relief could be granted. The court assumed that Ripley's testimony would be admissible, but concluded that Hetzel would be unable to establish either duty or causation.

## DUTY

Ripley testified about the standard of care applicable to trust accounts. In Ripley's expert opinion, Brouner breached a duty by depositing Hetzel's funds in his trust account, by immediately disbursing them to Parks, and by failing to make an accounting to Hetzel. In developing his opinion, Ripley relied in part on the Rules of Professional Conduct as they pertain to trust accounts.[4] The Supreme

---

[3]*Hizey v. Carpenter,* 119 Wn.2d 251, 259-60, 830 P.2d 646 (1992).

[4]Rules of Professional Conduct 1.14, "Preserving Identity Of Funds And Property Of A Client":

. . .

(b) A lawyer shall:

(1) Promptly notify a client of the receipt of his or her funds, securities, or other properties;

(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable;

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his or her client regarding them;

Court held in *Hizey v. Carpenter*[5] that a violation of the professional code for attorneys may be remedied only by a disciplinary proceeding. Such violation may not serve as the basis for a private cause of action. Brouner contends that Hetzel's private action for legal malpractice must fail under *Hizey* because it is based on an alleged violation of the Rules of Professional Conduct.

██ The Rules of Professional Conduct do not conclusively establish the standard of care in legal malpractice cases. It is the breach of a duty of care that is actionable, not the ethical violations per se.[6] But an expert may testify generally that an attorney's conduct violated the legal standard of care, using language from the Rules of Professional Conduct without explicitly referring to them.[7] And as Ripley testified, it is not only the professional code but also the common law that imposes upon attorneys a fiduciary duty with respect to client funds.[8] Thus, Ripley's use of the Rules of Professional Conduct in developing his expert opinion did not violate the holding in *Hizey*. Nothing in *Hizey* precludes a cause of action for legal malpractice arising from the mishandling of client funds.

Brouner contends, however, that even if the mishandling of client funds is a breach of duty that can be remedied in a civil action for malpractice, there is no basis for Hetzel's suit because the element of duty is missing in an action by a nonclient.

██ Under former rules requiring privity of contract, only a client could sue an attorney for malpractice. But

---

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

[5]*Hizey v. Carpenter*, 119 Wn.2d at 259.

[6]*Id.* at 265-66.

[7]*Id.* at 265.

[8]*In re Disciplinary Proceeding Against Deschane*, 84 Wn.2d 514, 516, 527 P.2d 683 (1974) ("Even if the Code of Professional Responsibility did not exist, a lawyer, as a fiduciary, owes the highest duty to his clients as a matter of law.").

privity of contract is no longer a prerequisite for suit against an attorney for malpractice.[9] In Washington, courts determine whether an attorney owes a duty to a nonclient by use of a multifactor balancing test set forth in *Trask v. Butler.*[10] As modified in *Trask*, that test presently inquires into:

1. The extent to which the transaction was intended to benefit the plaintiff;

2. The foreseeability of harm to the plaintiff;

3. The degree of certainty that the plaintiff suffered injury;

4. The closeness of the connection between the defendant's conduct and the injury;

5. The policy of preventing future harm; and

6. The extent to which the profession would be unduly burdened by a finding of liability.[11]

The first question, whether the plaintiff is an intended beneficiary of the transaction, is a threshold question; no further inquiry need be made unless such an intent exists.[12] Typically, the transaction establishing the duty to the nonclient is one that occurs between the attorney and an actual client. For example, the transaction at issue in *Trask* was advice given by the attorney to an actual client, the estate's personal representative. The court held that the advice given by the attorney to the personal representative was not intended to benefit the estate and its beneficiaries.[13]

The transaction in question is Brouner's use of his trust account to cash Hetzel's settlement draft. Brouner contends that Hetzel cannot be an intended beneficiary of this trans-

---

[9]*Bohn v. Cody*, 119 Wn.2d 357, 365, 832 P.2d 71 (1992).

[10]*Trask v. Butler*, 123 Wn.2d 835, 843, 872 P.2d 1080 (1994).

[11]*Id.*

[12]*Id.*

[13]*Id.* at 845.

action because the transaction had no connection with any of Brouner's actual clients.

■ We do not read *Trask* as holding that a duty to a nonclient can arise only as an offshoot of an established client relationship. This might be true if the *Trask* court had arrived at its relaxation of the privity requirement solely through an analysis based on the "more traditional" contract-based third party beneficiary concept.[14] But *Trask*'s multifactor test for relaxing the privity requirement is an evolution of negligence law. According to the California Supreme Court, in which the multifactor test originated, its use renders the third-party-beneficiary theory "conceptually superfluous."[15] Because a duty sounding in tort runs directly from the alleged tortfeasor to the injured party, it is not fatal to Hetzel's claim that he does not claim to be a third party beneficiary of a transaction involving the attorney and another party.

■ The threshold question in *Trask* is simply whether the transaction was meant to benefit the plaintiff.[16] In this case, the answer is inherent in the beneficial purposes of trust accounts. The purpose of depositing client funds in an attorney's trust account is to benefit the client by exerting a fiduciary's control over the client's money. The insurance draft recognizably represented client funds that Parks, as Hetzel's attorney, should have deposited in his own trust account. Instead, he sought to obtain cash immediately. When Brouner assisted Parks by allowing the draft to be deposited in his own trust account instead of Parks' account, Brouner stepped into the fiduciary role that would otherwise have belonged only to Parks. The fact that the money belonged to a client of another attorney did not change its essential character as client funds. We conclude Hetzel was an intended beneficiary of the transaction.

---

[14]*See Bowman v. John Doe Two*, 104 Wn.2d 181, 187, 704 P.2d 140 (1985).

[15]*Heyer v. Flaig*, 70 Cal. 2d 223, 227, 449 P.2d 161, 74 Cal. Rptr. 225 (1969).

[16]*Trask*, 123 Wn.2d at 843; *see also Leipham v. Adams*, 77 Wn. App. 827, 832, 894 P.2d 576, *review denied*, 127 Wn.2d 1022 (1995).

The next element under *Trask* to determine whether a duty is owed to a nonclient is the foreseeability of harm to the plaintiff if the duty is breached. The question is whether Brouner, in agreeing to distribute the entire $25,000 solely to Parks, reasonably should have foreseen that Parks would abscond with the money. Intentional or criminal conduct of a third person may be foreseeable "if the actual harm fell within a general field of danger which should have been anticipated."[17] Trust accounts exist because of the general danger that funds not protected with the care of a fiduciary will foreseeably vanish or dissipate. Parks' theft fell within the general field of danger. Harm to Hetzel was foreseeable in view of the highly irregular character of the transaction; it was designed to convert the draft to cash with unusual speed and then to put the cash in Parks' hands alone.

As to the third factor in the *Trask* test, there is no uncertainty about the injury. As to the fourth, the injury resulting from a trust account check going to the wrong person is directly connected to the conduct of the attorney whose trust account it is. And the fifth factor, the policy of preventing future harm, also weighs in favor of recognizing a duty to nonclients in Hetzel's situation. The use of a trust account to accommodate another lawyer's desire for ready cash is not a practice that should be condoned in view of the importance of trust accounts in protecting client funds.

> Lawyers routinely process funds through their trust accounts, aggregating very substantial amounts. Without hesitation, clients and other parties to transactions entrust these funds to lawyers, often without documentation. Confidence in the bar demands that lawyers preserve the integrity of entrusted funds

---

[17]*Johnson v. State*, 77 Wn. App. 934, 942, 894 P.2d 1366, *review denied*, 127 Wn.2d 1020 (1995); *see also Niece v. Elmview Group Home*, 131 Wn.2d 39, 50, 929 P.2d 420 (1997).

and that lawyers promptly, accurately and fully account for such funds.[18]

The sixth factor is the extent to which a finding of liability will unduly burden the legal profession. Policy considerations weigh against finding a duty to a nonclient if it will detract from an attorney's duties to an actual client, for example by creating a risk of divided loyalty or breach of confidence.[19] That concern is not present here. The duty Hetzel seeks to establish is simply that an attorney who takes charge of the funds of another attorney's client should treat those funds with the same care as is required for funds of his own client. Such a duty imposes no new professional burdens.

Because Hetzel can prove a set of facts to satisfy the elements of the *Trask* test, we conclude Hetzel has established that Brouner owed him a duty to protect his funds on deposit in his trust account the same as if Hetzel had been his own client.

## PROXIMATE CAUSATION

Brouner finally contends that assuming he owed Hetzel a duty, there was no allegation of facts that would establish a causal connection between Brouner's conduct and Hetzel's loss.

Cause in fact, also known as actual causation, is the "but for" consequence of an act. It connects the act to the injury. It is a matter of what has in fact occurred.[20] Cause in fact is generally for the trier of fact to decide.[21]

In considering this issue, the trial court assumed that Brouner breached a duty owed to his own clients to

---

[18]*Deschane*, 84 Wn.2d at 516.

[19]*See, e.g., Trask*, 123 Wn.2d at 845; *Bowman*, 104 Wn.2d at 188.

[20]*Bullard v. Bailey*, 91 Wn. App. 750, 755, 959 P.2d 1122 (1998).

[21]*Daugert v. Pappas*, 104 Wn.2d 254, 257, 704 P.2d 600 (1985).

maintain the integrity of their funds. The court perceived no causal link between this breach and Hetzel's loss. "The loss was due to Mr. Parks absconding, and not in any fashion to commingling." But the question is not whether Brouner caused Hetzel's loss by breaching a duty owed to his own clients. The question is whether Brouner caused Hetzel's loss by breaching a duty owed directly to Hetzel to safeguard the funds deposited in Brouner's trust account. Hetzel claims Brouner breached that duty by cashing the check through his trust account and then failing to account to Hetzel.

Brouner responds that the use of his trust account did not cause Hetzel's damage because once Hetzel endorsed the draft in blank, Parks could have deposited it in his own trust account or elsewhere.[22] It is indeed possible that Parks might have eventually succeeded in converting the draft to cash by some means other than Brouner's trust account. But in fact, Parks chose Brouner's trust account as the means, and thereby obtained cash immediately instead of having to wait a number of days for the draft to clear in the normal course of events.

Brouner did not have to accommodate Parks by depositing the draft in his own trust account. But once he agreed to do so, he became responsible for ensuring that the funds were distributed in accordance with Hetzel's wishes. Because only Brouner had the ability to write a check to Parks at that point, it is not impossible for Hetzel to prove that Brouner's issuance of the check was a cause of Hetzel's loss.

Hetzel also claims that Brouner caused his loss by failing to account to Hetzel for the transaction. Responding to this argument below, the trial court reasoned that an accounting would not have prevented the loss. The court observed that Brouner could have accurately accounted to Hetzel that he distributed the entire $25,000 to Parks, but there was no causal connection between "the lack of this infor-

---

[22]The Supreme Court rejected a similar argument in *Beal v. City of Seattle*, 134 Wn.2d 769, 787, 954 P.2d 237 (1998).

mation and the ability of Mr. Parks to abscond months later." This ruling was premature because the complaint does not state precisely when Parks absconded with the money. Hetzel says it was several months before he realized that Parks had stolen the money. Hetzel may be able to prove, consistent with his complaint, that immediate notification of the transaction involving Brouner's trust account would have prompted him to investigate sooner and stop Parks before he absconded with the cash.

We conclude that Brouner owed Hetzel a fiduciary duty with respect to the transaction involving Hetzel's settlement funds. And Hetzel may be able to prove that Brouner's breach of that duty proximately caused his loss. The judgment of dismissal is reversed.[23]

COLEMAN and WEBSTER, JJ., concur.

---

[23]By an order dated October 29, 1997, the Supreme Court disbarred Edward Parks. Washington State Supreme Court order, *In re Discipline of Parks*, No. 317\837 (Oct. 29, 1997). By an order dated November 5, 1998, the Supreme Court disbarred Dennis Brouner. *In re Discipline of Brouner*, No. 317\937 (Nov. 5, 1998).