24 P.3d 1098 (2001)
106 Wash.App. 647
Richard PRICE, as personal representative of the ESTATE OF William J. PRICE; Gregory Petersen and Teresa Petersen, husband and wife, Plaintiffs,
v.
The CITY OF SEATTLE, a municipal corporation, Defendant.
William J. Burg and Kay Burg, husband and wife; James J. Heil and Robin A. Hartnagel, husband and wife; Appellants,
v.
Elizabeth Parke, a single woman; The Leo and Elizabeth Silverman Family Trust, a Washington trust, Defendants,
v.
The City of Seattle, a municipal corporation, Respondent.
No. 46013-7-I.
Court of Appeals of Washington, Division 1.
June 11, 2001.
*1099 Karen A. Willie, Oskar E. Rey, Law Office of Karen A. Willie, Seattle, for Appellants.
*1100 Michael Rosenberger, Thomas Sean Sheehan, Asst. City Attorney, Seattle, for Respondents.
BECKER, A.C.J.
After unusually heavy rainfall, homes on Perkins Lane on Magnolia Bluff in Seattle were damaged by land sliding from an upper slope. In this lawsuit, the residents seek to hold the upland owner liable for failing to take preventive measures. Because there is no evidence that alterations on the upland property heightened the natural vulnerability of the bluff to groundwater pressure, the trial court correctly concluded the action failed for lack of a duty owed to the plaintiffs. The order dismissing their claims on summary judgment is affirmed.
Appellants own property on the south end of Perkins Lane in Seattle's Magnolia neighborhood, and formerly had their residences there. Perkins Lane is a primitive road that lies approximately 75 feet down a steep slope on Magnolia Bluff. It runs roughly parallel to the shoreline below. The City of Seattle owns the steep area from the top of the bluff down to the eastern edge of Perkins Lane. The City also owns Magnolia Boulevard, a city street with sidewalks at the top of the bluff, running parallel to Perkins Lane. On the boulevard, above and to the north of appellants' properties, is a small city-owned park.
Magnolia Bluff is made up of dense glacial till. The till has been naturally eroding for thousands of years. At the bottom of the bluff, slides have deposited an accumulation of loose wet soil, called colluvium, upon which the Perkins Lane homes are built. The 1700 block, where appellants lived, has experienced many slides of varying severity over the years.[1]
The present lawsuit addresses a series of landslides that occurred beginning in February 1996. The rainfall in that month was extreme. Slides flowing across the 1700 block of Perkins Lane bowed fences, piled mud and debris up against garages, and cracked walls in at least one home. Slides of surface soil came down from the top of the bluff, and a large block of glacial till came to rest directly above a home owned by Gregory Petersen. One of the slides also destroyed part of Petersen's garage.
On March 7, 1996, Mr. Petersen hired the environmental consulting firm Shannon & Wilson to evaluate the hazard posed by the block of till perched above his home. Shannon & Wilson advised Mr. Petersen by letter that the block was "an imminent hazard" and that rupture of the fire hydrant on Perkins Lane could result in a catastrophic landslide. Mr. Petersen sent the letter to the City. The City responded by hiring a contractor who began at once to remove the unstable soil.
While the excavation was in progress, a new crack became visible on the City's property at the top of the bluff, south of the area being excavated. Shannon & Wilson recommended that further excavation be stopped pending studies of soil stability. The City retained Shannon & Wilson to conduct the studies.
A slide began to move downhill from the new crack. It was later described as a deep-seated, rotational block landslide, different in kind from earlier slides of surface soil. On March 13, the City posted orders on the house belonging to appellants Heil and Hartnagel and also on an adjacent residence, warning the residents of imminent danger and requiring them to vacate. The City asked Shannon & Wilson to do further evaluations of the soil conditions in the new slide area. Shannon & Wilson concluded that the new slide had been triggered by the unprecedented rainfall that built up the water pressure in the till cliff to a critical level. Their final report on June 28, 1996, recommended that the City grade the falling bluff to a gentler slope, and install groundwater pumps before the autumn rainy season to alleviate the groundwater pressure that was causing the bluff slope to crack and slide.
After reviewing the report, the City advised some of the residents, in August, 1996, that the City would perform the recommended *1101 remedial measures. Between September 23 and October 3 the City removed over 11,000 cubic yards of soil and re-graded the bluff. However, it was not until early November that two test wells for groundwater pumps were finally drilled and tested. The pumps began removing water from the slide area on November 23. Soon after the two pumps were installed, Shannon & Wilson recommended six more pumps to alleviate groundwater pressure near the residents' homes. The City approved this measure on December 13, but bad weather intervened before the additional wells could be installed. Snow fell heavily on December 26, followed by warmer temperatures and abundant rain through January 2, 1997. The rain, combined with the melted snow, caused widespread emergency throughout the Seattle area due to flooding and landslides.
Landslide activity on Magnolia Bluff increased after the snowmelt, affecting all of the residences below the site of the March slide, including Burg's. The City posted vacate notices on the home of appellants Burg and on a neighboring property. The six homes on the 1700 block of Perkins Lane continued to slide down the hill throughout the early months of 1997. All of them were eventually destroyed and rendered uninhabitable.
The appellants and other residents sued the City of Seattle alleging negligence, inverse condemnation, and trespass. The City successfully moved for summary judgment to dismiss all claims. Burg and Heil Hartnagel appeal.
This court reviews a grant of summary judgment de novo, engaging in the same inquiry as the trial court. Bishop v. Miche, 137 Wash.2d 518, 523, 973 P.2d 465 (1999). The appellate court considers the facts and all reasonable inferences from those facts in the light most favorable to the non-moving party. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is proper if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. CR 56(c).

Negligence
The theory of the residents' negligence case is that the City had a duty to take reasonable measures to stabilize the slope upon learning in March, 1996, that its land on the bluff above Perkins Lane was cracking and sliding. They allege that the City breached its duty by not acting more quickly to install dewatering wells, and that but for the City's failure to complete the installation of the wells, their homes would not have been destroyed. The City's motion for summary judgment put only the element of duty at issue, not causation, and we therefore do not consider whether evidence supports the appellants' theory that quicker action by the City would have prevented damage to the homes. The only question in this appeal is whether a duty was owed.
The residents contend that the City, as a landowner, owed them a general duty of reasonable care. They would have us follow a California landslide case, Sprecher v. Adamson, 30 Cal.3d 358, 178 Cal.Rptr. 783, 636 P.2d 1121 (1981). In Sprecher, a trial court had granted summary judgment to an uphill landowner whose land slid and damaged a downhill landowner's home. The California Supreme Court reversed, adopting a duty analysis that stems from Rowland v. Christian, 69 Cal.2d 108, 443 P.2d 561 (1968). Rowland v. Christian is the case in which California eliminated distinctions between duties owed to trespassers, licensees, and invitees. To prove negligence under Rowland, the plaintiff need only prove that the possessor of land, under all the circumstances, did not exercise reasonable care in the management of the property. Rowland, 69 Cal.2d at 119, 70 Cal.Rptr. 97, 443 P.2d 561; Sprecher, 178 Cal.Rptr. at 790, 636 P.2d 1121.
Following Rowland, the Sprecher court overruled cases holding that a possessor of land is not liable to persons outside the premises for harm caused by a natural condition on the land. The court adopted instead the general standard of reasonable care and held that the distinction between natural and artificial conditions was no longer a significant factor determining when a duty is owed. Sprecher, 178 Cal.Rptr. at 790, 636 P.2d 1121. *1102 The duty to control and manage one's land for the benefit of neighbors and persons outside the land arises, under Sprecher, merely from the possession of land with its attendant right to control conditions thereon. Sprecher, 178 Cal.Rptr. at 789, 636 P.2d 1121. The court reasoned that under California law, it would make no sense to impose a duty of reasonable care to protect trespassers, invitees and licensees, but not neighbors, from harms threatened by a natural condition of the land. Sprecher, 178 Cal.Rptr. at 790, 636 P.2d 1121.
Washington has not followed California down the path marked out by Rowland v. Christian. In Younce v. Ferguson, 106 Wash.2d 658, 724 P.2d 991 (1986), personal injury plaintiffs invited the Washington Supreme Court to reject common law classifications of trespasser, invitee, and licensee in favor of a general negligence standard of reasonable care. After thorough consideration of Rowland, our Court maintained its adherence to the common law classifications, finding that they offer a degree of stability and predictability that are not afforded by a "unitary standard" of reasonable care under all of the circumstances. See Younce, 106 Wash.2d at 666, 724 P.2d 991. Guided by Younce, we decline to follow Sprecher. The standard of reasonable care under all the circumstances does not define the duty owed by the City of Seattle as a property owner to its downhill neighbors on Perkins Lane.
What, then, is the duty of a possessor of land with respect to dangers posed to adjacent property by natural conditions on the land? The City proposes that we answer that question by adopting section 363 of the Restatement (Second) of Torts. Section 363 provides:
(1) Except as stated in Subsection (2), neither a possessor of land, nor a vendor, lessor, or other transferor, is liable for physical harm caused to others outside of the land by a natural condition of the land.
(2) A possessor of land in an urban area is subject to liability to persons using a public highway for physical harm resulting from his failure to exercise reasonable care to prevent an unreasonable risk of harm arising from the condition of trees on the land near the highway.
Restatement (Second) of Torts, § 363 (1965).
Section 363 of the Restatement somewhat awkwardly combines a general statement on the liability for harm caused by a natural condition of the land with a very specific statement on the liability for harm caused by dangerous trees near a highway in an urban area. Because we find adequate guidance in the pre-Restatement case of Albin v. National Bank of Commerce, 60 Wash.2d 745, 375 P.2d 487 (1962), we see no reason to incorporate section 363 of the Restatement into our analysis.
In Albin, the defendant National Bank of Commerce owned land abutting a road. During a windstorm a tree adjacent to that road fell on a motorist. A wrongful death action ensued. The plaintiff's theory of the bank's liability was that a recent logging operation had carelessly left the remaining snags unprotected and unsupported. The bank took the position that it should have been dismissed from the suit outright, based on its lack of actual knowledge of the dangerous condition of the tree. The Supreme Court held, however, that the trial court had properly submitted the issue of the bank's liability to the jury to determine whether the bank had constructive notice of the hazardous condition created by the logging operation:
The trial court properly concluded that there was no duty to inspect and no liability so far as the owner was concerned (absent knowledge of a hazardous condition), so long as the forest remained in its natural condition; that the liability of the owner, if any, must be predicated on a dangerous condition created on its land, as a result of the logging operation, of which the owner knew or should have known; and presented the case to the jury on that theory.
Albin, 60 Wash.2d at 752, 375 P.2d 487 (emphasis added).
The appellants here contend they introduced evidence sufficient to establish the City's duty under Albin by showing the City had actual or constructive notice of a dangerous condition on its steep land above Perkins *1103 Lane. Specifically, they introduced evidence showing that the City was aware in March, 1996, of the potential for catastrophe if the cracks in the bluff were left untreated. But under Albin, to establish a duty owed by a landowner to prevent harm to others outside the land, it is not enough merely to establish that the landowner has actual or constructive notice of a dangerous natural condition on the land. The landowner must have notice of an alteration to the land that makes it more dangerous than if it had remained in its natural condition, analogous to the heightened risk created by logging operations on the land next to the highway in Albin.
The residents contend, however, that a pure notice standard is the modern trend in the law of liability for harm caused by conditions on the land. In support of this contention, they cite Lewis v. Krussel, 101 Wash. App. 178, 2 P.3d 486 (2000). The court there affirmed an order of summary judgment, dismissing a claim against a landowner for damage caused by two healthy trees that fell on a neighbor's home in a windstorm. After discussing Albin and authority from other jurisdictions, the Lewis court concluded that landowners in urban areas cannot be free of liability if they allow their noticeably defective or hazardous trees to go untended. According to Lewis, "one whose land is located in or adjacent to an urban or residential area and who has actual or constructive knowledge of defects affecting his trees has a duty to take corrective action." Lewis, 101 Wash. App. at 187, 2 P.3d 486.
We are not persuaded that the duty of a landowner with respect to landslide-prone slopes is, or should be, the same as the duty of a landowner with respect to defective trees. While cases cited in Lewis document the evolution of the law toward establishing a duty of a landowner to protect against patently dangerous trees in urban areas, no similar trend has emerged with respect to patently dangerous slopes. We hold that the duty of possessors of land to prevent landslides is limited, as indicated by Albin, to situations where the possessor of land has actual or constructive notice of a hazard produced by an alteration to the natural condition of the land.
In this case, to establish that the City had a duty to take timely corrective measures, the residents first had to show that an alteration on the City's property caused the bluff to become unnaturally vulnerable to the natural forces at work. That showing was not made here. The residents contended that the City had altered the natural condition of the bluff above Perkins Lane by removing shrubs and trees at the top, next to Magnolia Boulevard, and replacing them with the grassy area that is now a city park. In moving for summary judgment, however, the City brought forth evidence that the slope of the grassy area was natural. The City pointed out that engineer Erik Mikklesen, an expert witness for the residents, had acknowledged in deposition that the City's curbs and pavement on Magnolia Boulevard actually helped divert water away from the bluff. He could not offer an opinion that the City had done anything affirmatively to increase the risk of the slides that occurred in 1996 and 1997.
Responding to the City's motion for summary judgment, the residents submitted documents showing that after a slide in 1988, Shannon and Wilson recommended to the Perkins Lane residents and to the City that bluff stabilization measures be undertaken, including the capture of water from the park property at the top of the bluff. The City did not install the catch basin and bench drain recommended by this report. The residents also presented expert testimony from a hydrologist, Dr. Malcolm Leytham, to the effect that there was more runoff as the result of the grassy area: "The conversion of vegetation in this area from shrubs and trees to grass can be expected to have increased the rates and volumes of surface and shallow subsurface runoff." But Dr. Leytham's declaration is too conclusory to raise an issue of fact. It does not quantify the assumed increase in runoff, and it does not contradict the City's evidence specifically showing that the net runoff onto the bluff had actually been reduced by the installation of the curb. "A nonmoving party in a summary judgment may not rely on speculation, argumentative assertions that unresolved factual issues remain, or in having its affidavits *1104 considered at face value; for after the moving party submits adequate affidavits, the nonmoving party must set forth specific facts that sufficiently rebut the moving party's contentions and disclose that a genuine issue as to a material facts exists." Seven Gables v. MGM/UA Entertainment, 106 Wash.2d 1, 13, 721 P.2d 1 (1986). See also Melville v. State, 115 Wash.2d 34, 41, 793 P.2d 952 (1990) ("An opinion of an expert which is simply a conclusion or is based on an assumption is not evidence which will take a case to the jury."). Neither Dr. Leytham's testimony, nor the Shannon & Wilson report, nor any other evidence presented by the residents, demonstrated that the alteration at the top of the bluff produced a significant net increase in the flow of water down the slope of the bluff compared to what would occur if the native shrubs and trees had been left in their natural condition. In short, the plaintiffs' evidence does not contradict Shannon & Wilson's assessment that the instability of the slope in 1996 was "a natural occurrence":
In our opinion, this instability was a natural occurrence. There appear to be no significant human factors that contributed to the slope instability. The chief contributing factors were the existing soil conditions, bluff steepness, and the extraordinary groundwater pressures and ground saturation caused by the prolonged above-normal winter and spring rains, and intense February and April storms.
Applying the principle developed in Albin, we conclude the City, as a possessor of land, owed no duty to the appellants to take measures to stabilize the slope above Perkins Lane.
This conclusion is consistent with the surface water doctrine, also invoked by the residents as a theory of liability. A landowner is liable for damage caused by errant surface water flows only where the landowner has engaged in activities that alter the flow. See, e.g., Currens v. Sleek, 138 Wash.2d 858, 865-67, 983 P.2d 626 (1999). The appellants' failure to document unnatural runoff resulting from the changes at the top of the bluff defeats their claim that the City is liable for channeling the water. Their evidence is insufficient to justify going forward with their claims based on the surface water doctrine.
The residents also contend that the City assumed a duty towards them as a voluntary rescuer when, in March 1996, the City hired a construction company to remove the block of till above the Petersen house and excavate and grade the sliding bluff. A defendant who renders gratuitous aid by attempting a voluntary rescue is required to use reasonable care in such efforts. Where failure to exercise reasonable care increases the risk of harm to those whom the rescuer is trying to assist, the rescuer may be liable for physical damage thereby caused. Brown v. MacPherson's Inc., 86 Wash.2d 293, 299, 545 P.2d 13 (1975). "Typically, liability for attempting a voluntary rescue has been found when the defendant makes the plaintiff's situation worse by: (1) increasing the danger; (2) misleading the plaintiff into believing the danger had been removed; or (3) depriving the plaintiff of the possibility of help from other sources." Folsom v. Burger King, 135 Wash.2d 658, 676, 958 P.2d 301 (1998) (citing W. Page Keeton, Prosser and Keeton on The Law of Torts § 56 (5th ed.1984)). Thus, the City may be liable for the damage to the residents' homes if it attempted to stop the bluff's collapse and by doing so, either increased the risk of harm to the residents, or induced the residents to rely on the City's assistance.
The City did order excavation on the bluff to deal with the large block of till that threatened the Petersen residence and also to protect the City's fire hydrant. But the evidence is undisputed that the March slides of surface soil, to which the City was responding, were unrelated to the deep-seated slide event that is the focus of this lawsuit. There is no evidence that the excavation and grading undertaken by the City increased the risk of landslides. The residents have not shown how any of the City's actions could have misled them into thinking the danger announced by the new crack discovered in early March had been removed. They have not shown that the City's efforts prevented or discouraged them from using their own financial resources to stabilize the slope.
*1105 The City cannot be held liable as a voluntary rescuer.

Inverse Condemnation and Trespass
The order of summary judgment also dismissed the residents' claim that the landslide of City-owned land constituted inverse condemnation or trespass. The phrase "inverse condemnation" describes a government's appropriation of property without formal condemnation proceedings. Phillips v. King County, 136 Wash.2d 946, 957, 968 P.2d 871 (1998). To have a taking, some governmental activity must have been the direct or proximate cause of the landowner's loss. Phillips, 136 Wash.2d at 966, 968 P.2d 871.
In Phillips, landowners sued King County for inverse condemnation after King County issued a permit to a developer adjacent to the landowners to build a drainage system on a county right of way that caused water to flow onto the landowners' property at a highly unnatural rate. The developer deeded the right of way to the county upon the drainage system's completion. The trial court granted summary judgment in favor of the county. The Washington Supreme Court affirmed a Court of Appeals decision reversing the order of summary judgment. The Court held that the county's mere issuance of a permit did not give rise to a taking, but that a taking did arise from the county's ownership and control of the property upon which the drainage system was built. Phillips, 136 Wash.2d at 968-69, 968 P.2d 871.
Similar to the landowners in Phillips, the residents argue the City took their property by artificially channeling water from its own property onto the bluff and thereby undermining its stability. Their inverse condemnation claims fail for the same reason as their negligence claims: there is no evidence that the City artificially channeled water onto the bluff.
To support their trespass action, the residents rely on Bradley v. American Smelting and Refining Co., 104 Wash.2d 677, 691, 709 P.2d 782 (1985), in which the court recognized that emission of air pollutants can give rise to an action for intentional trespass. The Bradley Court stated that the intent element of trespass can be shown where the actor "knows that the consequences are certain, or substantially certain, to result from his act". Bradley, 104 Wash.2d at 682, 709 P.2d 782.
The residents essentially argue that the City knew that a landslide was a substantially certain consequence of its failure to take preventive measures. But they have provided no authority for the proposition that an "act", as used in defining the elements of trespass, means a failure to act. Stated in terms of a failure to act, their trespass claim is no different from their negligence claim. Cf. Lewis v. Krussel, 101 Wash.App. at 183, 2 P.3d 486 (nuisance claim in case involving fallen trees, grounded in inaction, need not be considered separately from the negligence claim). As there is no evidence that the City acted to cause the landslide, the trespass claim also fails.
The summary judgment of dismissal is affirmed.
GROSSE, J., and COX, J., concur.
NOTES
[1] In 1980, when a landslide destroyed a portion of Perkins Lane to the north of the Burg and Heil Hartnagel properties, Burg and Hartnagel and others unsuccessfully sought a writ of mandamus to force the City to repair the road. See Burg v. Seattle, 32 Wash.App. 286, 647 P.2d 517 (1982).