43 P.3d 526 (2002)
110 Wash.App. 798
William J. BURG and Kay Burg, husband and wife; James J. Heil and Robin A. Hartnagel, husband and wife, Appellants,
v.
SHANNON & WILSON, INC., a Washington corporation, Respondent.
No. 47434-1-I.
Court of Appeals of Washington, Division 1.
February 19, 2002.
Publication Ordered April 1, 2002.
*528 Karen Willie, Stephan Fjelstad, Seattle, for Appellants.
Stanton Beck, Annmarie Petrich, Seattle, for Respondent.
*527 APPELWICK, J.
Appellants own houses that were severely damaged by landslides on Perkins Lane West. Shannon and Wilson (S & W) is an engineering firm that was hired by the City of Seattle, that owns the cliff property above appellants' residences, to make recommendations about the land's stability. Appellants argue that S & W was negligent in not informing them of its recommendation to the City that dewatering wells be installed to increase the bluff's stability. The central question on appeal is whether appellants were owed a legal duty to be warned of S & W's recommendations. The trial court concluded no duty was owed and ordered summary judgment in favor of S & W. Since appellants have not established that S & W owed them a legal duty, the trial court did not err in granting summary judgment for S & W.

FACTS
Appellants own houses that were severely damaged by landslides on Perkins Lane West. The City owns the bluff property above their houses. S & W is a geotechnical engineering firm that was hired by the City to make recommendations about increasing the land's stability.
Significant landslides have occurred on Perkins Lane West in 1961, 1972, 1982, 1986 and the spring of 1996. Additionally, in 1980, in response to a major landslide that damaged a portion of Perkins Lane, Burg, Hartnagel and other property owners unsuccessfully sought a writ of mandamus to force the City to repair Perkins Lane. Burg v. Seattle, 32 Wash.App. 286, 647 P.2d 517 (1982).
Due to extremely high rainfall throughout the winter of 1995-1996, the slide problems on Perkins Lane West and the bluff above it worsened. In March 1996, S & W observed cracks in the City owned land indicating that areas of Perkins Lane West were moving toward the Puget Sound. The City hired S & W to evaluate the cause of the latest landslides and to make recommendations to improve stability. On May 10, 1996, S & W sent a letter to the City recommending the installation of two dewatering wells.
On June 21, 1996, William Burg hired S & W to visit his property and issue a report on his property's current instability. Burg was using the report as a supporting document for an equity loan on the property. S & W issued the report to Burg on June 25, 1996. The report included in relevant part:
Recent survey readings by Seattle Parks indicate that the large slide has nearly stopped moving.... In our opinion, the Burg residence does not show signs of slope instability at this time.... As with any property on sloping ground in the Seattle area, there is some risk of slope instability. Although drainage and other earth stabilizing measures can be implemented, and deep foundations can be installed to mitigate the effects of earth movement, the risks cannot be completely eliminated.
During March and June of 1996, Perkins Lane continued to slide toward the water. By late June, the Heil/Hartnagel residence was damaged beyond repair.
On June 28, 1996, S & W gave their final report to the City. The report indicates, "The area affected by slope movements includes the steep bluff and Perkins Lane West, both owned by the City of Seattle, and private properties on the downhill side (west) of the lane." The "Final Scope of Work" dated March 20, 1996, clarifies that, "The work for this project involves evaluations, explorations, and studies regarding landslides and instability on Magnolia Boulevard above the 1700 block of Perkins Lane West." (Emphasis added.) The report, however, also discusses *529 the stability conditions on the Burg and the Heil/Hartnagel properties. Specifically, the report notes,
The area of current instability primarily involves four private properties to the west of Perkins Lane, the Perkins Lane right-of-way, and the bluff area (owned by the City of Seattle) to the east of the four properties. The private properties involved are ... owned by Parks, Hartnagel, Petersen, and Snellman/Price.... To the north, on properties owned by Silverman and Burg, signs of instability have also developed; however, these signs of instability reportedly did not appear until sometime after the instability was observed to the south.
It went on to recommend:
In addition to permanent dewatering wells along the lane (or other permanent dewatering system to improve overall stability of bluff and colluvium), each property owner should consider installing new or additional trench subdrains to supplement other drainage provisions. All new work on the private properties should be based on recommendations by a qualified geotechnical consultant.
The report concluded:
Remedial measures are required to improve stability. As of June 5, the bluff top was still moving. As weather gets better (drier), movement may stop; however, the permanent remedial measures should be taken as protection against additional bluff movement and deterioration during future wet weather periods. The remedial measures should be taken prior to the next rainy season, which normally begins about mid-October.
From September 23 to October 3, 1996, the City regraded and hydroseeded the bluff above Perkins Lane. By late October, the City authorized the installation of two dewatering wells. The two wells were drilled on November 9 and 11, 1996. On December 5, 1996, S & W recommended the installation of six additional wells with monitoring of their effectiveness. The City approved their recommendation and work was to begin on December 26, 1996.
From December 26, 1996 until January 1, 1997, a severe storm raged across the Puget Sound, depositing large amounts of snow and rain, and preventing the installation of the additional dewatering wells. Following this storm, the Burg residence was damaged beyond repair.
Appellants and other Perkins Lane property owners brought suit against the City for failing to take preventative measures to prevent the landslide. Price v. City of Seattle, 106 Wash.App. 647, 24 P.3d 1098, review denied, 145 Wash.2d 1011, 37 P.3d 291 (2001). In analyzing whether the City owed a legal duty to the property owners, this court held, "Because there is no evidence that alterations on the upland property heightened the natural vulnerability of the bluff to groundwater pressure, the trial court correctly concluded the action failed for lack of a duty owed to the plaintiffs." Price, 106 Wash. App. at 649, 24 P.3d 1098.
In this subsequent action against the City's engineers, the trial court concluded that S & W owed no duty to appellants and ordered summary judgment for S & W.

ANALYSIS
The central question is whether S & W had a duty to warn appellants of the remedial measures that it had recommended the City take in order to increase the stability of the bluff property above Perkins Lane. Appellants have failed to establish that a legal duty existed.
I. Standard of Review
The trial court dismissed this negligence action against S & W on a motion for summary judgment. We affirm orders granting summary judgment only when satisfied, after considering the facts in the light most favorable to the nonmoving party, that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. City of Seattle v. State, 136 Wash.2d 693, 697, 965 P.2d 619 (1998).
Appellants contend that S & W negligently failed to warn them of remedial measures applicable to their properties that S & W had recommended to the City. "To *530 prove actionable negligence, a plaintiff must establish: (1) the existence of a duty owed to the complaining party; (2) a breach of that duty; (3) a resulting injury; and (4) that the claimed breach was the proximate cause of the injury." Hansen v. Friend, 118 Wash.2d 476, 479, 824 P.2d 483 (1992). The existence of a duty is a threshold question. If there is no duty, appellants have no claim. Folsom v. Burger King, 135 Wash.2d 658, 671, 958 P.2d 301 (1998). The plaintiff has the burden of establishing the existence of a duty. Lake Washington Sch. Dist. No. 414 v. Schuck's Auto Supply, Inc., 26 Wash.App. 618, 621, 613 P.2d 561 (1980).
In a negligence action, a defendant's duty may be predicated on violation of statute or of common law principles of negligence. Bernethy v. Walt Failor's, Inc., 97 Wash.2d 929, 932, 653 P.2d 280 (1982). Appellants argue either that a duty arose from Washington statutes and regulations which set out professional standards for engineers, from a position as a third party beneficiary to S & W's contract with the City, gratuitously from their relationships with S & W or directly from the Burg and S & W contract.
II. Application of RCW 18.34 and WAC 196-27
Appellants contend that S & W owed them a legal duty "embodied" by professional engineering standards set forth in chapter 18.34 RCW and chapter 196-27 WAC. Under the RCW, registrants must be duly certified "in order to safeguard life, health, and property, and to promote the public welfare." RCW 18.43.010 (emphasis added). Appellants highlight the following portions of the RCW:
As used in this chapter "misconduct or malpractice in the practice of engineering" shall include but not be limited to the following:
(2) Being willfully untruthful or deceptive in any professional report, statement or testimony; ...
(6) Violation of any provisions of this chapter; ...
(11) Committing any other act, or failing to act, which act or failure are customarily regarded as being contrary to the accepted professional conduct or standard generally expected of those practicing professional engineering or land surveying.
RCW 18.43.105.
The board shall have the exclusive power to fine and reprimand the registrant and suspend or revoke the certificate of registration of any registrant who is found guilty of:
....
Any gross negligence, incompetency, or misconduct in the practice of engineering or land surveying as a registered engineer or land surveyor.
RCW 18.43.110.
The administrative rules also state that their purpose is to "safeguard life, health, property and to promote the public welfare." WAC 196-27-010 (emphasis added). Appellants cited the following administrative regulations:
(1) Registrants shall hold paramount the safety, health, and welfare of the public in the performance of their professional duties.
(a) Registrants shall recognize that the lives, safety, health, and welfare of the general public are dependent upon engineering/land surveying judgments, decisions, and practices....
(c) Registrants whose professional judgment is overruled under circumstances where the safety, health, and welfare of the public are endangered shall inform their clients or employers of the possible consequences....
(2) Registrants shall perform services only in areas of their competence.
(3)(b) Registrants shall be objective and truthful in professional reports, statements, or testimony. They shall include all relevant and pertinent information in such reports, statements, or testimony....
(4) Registrants shall act in professional matters for each employer or client as faithful agents or trustees, and shall avoid conflicts of interest.
(a) Registrants shall avoid all known or potential conflicts of interest with their employers or clients and shall promptly *531 inform their employers or clients of any business association, interest, or circumstances which could influence their judgment or the quality of their services. (b) Registrants shall not accept compensation from more than one party for services on the same project, or for services pertaining to the same project, unless the circumstances are fully disclosed to and agreed to, by all interested parties.
WAC 196-27-020 (emphasis added).
Washington case law has not addressed whether these statutes and regulations establish a cognizable duty in a negligence action against professional engineers. Therefore, both parties have relied on the holdings in legal malpractice case law. However, the legal malpractice cases provide scant assistance to our decision in this case.
In reviewing a legal malpractice action, this court has held that a violation of the Rules of Professional Conduct (RPC) does not create an independent cause of action for malpractice, nor do the ethical rules for attorneys establish the appropriate standard of care in a civil action. Hetzel v. Parks, 93 Wash.App. 929, 935, 971 P.2d 115 (1999) (citing Hizey v. Carpenter, 119 Wash.2d 251, 265-66, 830 P.2d 646 (1992)). In Hizey, the Washington Supreme Court reached the same conclusion basing its decision on two main points. First, the Court said that the specific disclaimer in the RPC expressly denounced its creation of an independent cause of action. 119 Wash.2d at 259, 830 P.2d 646. Second, the RPC could not be admitted as evidence of the standard of care because it was adopted by the Court and not by the Legislature. 119 Wash.2d at 261-62, 830 P.2d 646.
Appellants argue that since the engineering regulations do not have a specific disclaimer and since they were created by the Legislature, then our holding should be the opposite of the holding in the legal malpractice cases, that is, a duty is created by them. See RCW 18.43.110; WAC 197-27-010(3). This logic is flawed. Appellants' arguments may well distinguish Hizey and Hetzel, but that is all that they do.
To sustain a negligence action against an individual, "the duty must be one owed to the injured plaintiff, and not one owed to the public in general." Taylor v. Stevens County, 111 Wash.2d 159, 163, 759 P.2d 447 (1988). The statute and regulations cited by appellants indicate that professional engineers owe duties to the public, to their clients and to their employers. Except for Burg, appellants were not clients or employers of S & W.[1] Appellants offer no other evidence of a special relationship that would invoke a duty under the statute or regulations. The broad pronouncements that engineers owe a general duty to the public welfare alone, do not establish that engineers owe a duty to any identifiable group or individual. Appellants have not met their burden of articulating how these statutes and regulations impose a duty on S & W specific to them individually. Summary judgment was appropriate.
III. Third Party Beneficiary
Appellants argue that they were owed a duty as third party beneficiaries to the contract between the City and S & W. "[C]reation of a third-party beneficiary contract requires that the parties intend that the promisor assume a direct obligation to the intended beneficiary at the time they enter into the contract." Del Guzzi Constr. Co., Inc. v. Global Northwest, Ltd., Inc., 105 Wash.2d 878, 886, 719 P.2d 120 (1986) (quoting Postlewait Const., Inc. v. Great American Ins., 41 Wash.App. 763, 765, 706 P.2d 636 (1985)). This requires that the court, "not examine the minds of the parties, searching for evidence of their motives or desires. *532 Rather, [it] must look to the terms of the contract to determine whether performance under the contract would necessarily and directly benefit the petitioners." Lonsdale v. Chesterfield, 99 Wash.2d 353, 362, 662 P.2d 385 (1983).
The contract between S & W and the City was for evaluating instability and recommending remedial measures on City property. The contract recited no intent to benefit appellants or their property. It is conceivable that recommendations might have resulted, which collaterally benefited the appellants. The contract gave S & W no authority to actually implement any of its recommendations. The City still had to decide whether to accept and act upon any of the recommendations. Therefore, the contract may not have provided any benefit to the appellants at all. Even if the recommendations might have provided benefits, there was no way at the time of contracting to tell how much or how directly. The fact that the final recommendations to the City included suggestions for action the appellants could take does not make the appellants intended third party beneficiaries of the contract. At best, appellants were incidental beneficiaries.
IV. Gratuitous Duty
Appellants further contend that S & W owed them a gratuitous duty. As a general rule, there is no legal duty to act on behalf of a stranger. Folsom v. Burger King, 135 Wash.2d 658, 674, 958 P.2d 301 (1998). But if someone gratuitously undertakes to perform a duty, they can be held liable for performing it negligently. Sheridan v. Aetna Cas. & Sur. Co., 3 Wash.2d 423, 438, 100 P.2d 1024 (1940). Some affirmative act or promise to gratuitously undertake the duty must be established in order for the doctrine to be applied. See Sheridan, 3 Wash.2d at 423, 100 P.2d 1024 (defendant insurance company expressly undertook the duty to inspect a hotel elevator and make periodic reports to the city on its safety); Brown v. MacPherson's, Inc., 86 Wash.2d 293, 298-300, 545 P.2d 13 (1975) (defendant State of Washington told an avalanche expert that the State would "take care of the matter" and warn the property owners of the impending danger, thereby gratuitously undertaking a duty to warn the property owners of the danger).
Appellants do not allege an oral promise and have provided no persuasive evidence that S & W acted in any way that would indicate they had voluntarily undertaken a duty directly to appellants. Appellants point out that S & W had contact with Heil and Hartnagel. Hartnagel stated that she had given a key to S & W so that they could come onto her property during their work for the City in 1996. Mere contact, however, does not make a promise.
Appellants also argue that the contract between Burg and S & W carried with it a gratuitous promise to apprise him of the recommendations S & W was making to the City. A gratuitous duty will not arise from the contract itself; it would not be gratuitous if supported by consideration. The contract did not require that S & W apprise Burg of continuing remedial measures that could or should be taken on his property or the City's. Rather, the contract between Burg and S & W was to support his application for an equity loan on the property. There is no evidence that S & W promised to go beyond the specific purpose of the contract and give Burg other reports, then or in the future, about the Burgs' or the City's properties. Thus, appellants do not present evidence of any statement or any affirmative conduct that could amount to a gratuitous undertaking to apprise them of S & W's recommendations to the City or otherwise protect them. Since there was no gratuitous undertaking, there was no duty to breach.
V. Direct Contractual Obligation with Burg
Appellants next argue that the Burgs were owed a duty based on their contract with S & W. For an obligation to arise under contract, there must be mutual assent to its terms. Saluteen-Maschersky v. Countrywide Funding Corp., 105 Wash.App. 846, 22 P.3d 804 (2001).
Appellants contend that a legal duty arose under the contract between S & W and the Burgs to warn them of the recommendations *533 made to the City or to warn them of future stability issues that affected their property. William Burg hired S & W on June 21, 1996. The trial record merely establishes that S & W was hired "to visit the site and issue a letter report regarding the stability conditions of [the Burgs' property]." A letter report was sent to the Burgs on June 25, 1996. The letter reported,
At your request, we have completed a review of previous geotechnical reports for your property, visited the site on June 24, 1996, and prepared this letter report. We understand that the purpose of this letter is to support your application for a home equity loan on this property.
....
In February 1996, a large landslide affected Magnolia Bluff, Perkins Lane and private properties to the south of your property. Indications of movement of this slide commenced on February 8, 1996, and ground movements in the order of 10 feet have been recorded; however, no movements were noticed on the Burg property until mid May. At that time, we observed a crack in the driveway and through the carport at the Burg property; however, no distress was observed in the residence. The cracks have not opened between our visits on May 20 and June 24, 1996. Recent survey readings by Seattle Parks indicate that the large slide has nearly stopped moving.

....
In our opinion, the Burg residence does not show signs of slope instability at this time. (Emphasis added.) S & W's letter goes on to warn the Burgs, "As with any property on sloping ground in the Seattle area, there is some risk of slope instability. Although drainage and other earth stabilizing measures can be implemented ... the risks cannot be completely eliminated." Thus, S & W contracted to review the past and present stability issues of the Burg property and provide a report on the property's current condition. The record before us indicates that they fulfilled their contract. The letter states the condition of the City's slope at that time, and states the condition of the Burg lot at that time. Appellants have presented no evidence that S & W contractually agreed to any other work, then or in the future, whether to notify the Burgs of its recommendations to the City or to warn them of continuing stability issues on the Burgs property after completion of their contract on June 25, 1996. Therefore, S & W owed no additional duty to the Burgs under their contract to notify them of future instability or recommendations.
Based on the foregoing analysis we do not address S & W's defenses of assumption of risk and collateral estoppel.
VI. Conclusion
The trial court properly granted S & W's motion for summary judgment finding appellants failed to meet their burden to establish the existence of a legal duty. We affirm.
GROSSE, J., and BECKER, Acting C.J., concur.
NOTES
[1] The Burgs allege that a conflict of interest existed between them and the City. Therefore, S & W could not have worked for them simultaneously without a conflict of interest and a breach of duty occurring. Even assuming this duty existed, was actionable privately, and was breached; causation of any damages is problematic. William Burg testified that S & W's performance under the contract was reasonable and that their letter report to him was fair and accurate. The potential conflict of interest did not materialize; the Burg contract did not conflict in scope with the City contract and did not interfere with S & W's performance under the Burg contract. No harm flowed from any alleged conflict in any event.