[No. 39771.    En Banc.    April 2, 1970.]

CLYDE WELLS, *Respondent,* v. THE CITY OF VANCOUVER, *Appellant.*\*

*R. DeWitt Jones,* for appellant.

*John L. La Londe* (of *La Londe, La Londe & Ladley*), for respondent.

McGOVERN, J.—The highest wind speeds recorded at any time in the area of Vancouver, Washington, occurred on October 12, 1962.

After being advised of those anticipated high winds, plaintiff proceeded to the municipal airport to check the security of his airplane. While there, he inspected his airplane and assisted others in moving and anchoring theirs. He said that the wind was blowing from the east but was not exceptionally strong. When he was north of the hangar

\*Reported in 467 P.2d 292.

in question, at about 5:25 p.m., he said that he heard a "tearing sound"; he turned, looked, and saw the hangar roof lifting into the air; he claimed that pieces of plywood were rising some 50 feet into space and that parts of the roof were "falling like leaves". He testified that he started to run but, although some 250 feet from the hangar, was hit on the right leg by a piece of the falling plywood. His leg was fractured.

Plaintiff brought suit against the city for the damages which he sustained and rested his case on the proposition that the city was negligent in the structural design of the disintegrated hangar, a part of which had struck him. He argued that the applicable building code in effect at the time of construction required that the hangar be erected with a vertical parts wind resistance factor of 15 pounds per square foot, but that the hangar doors failed in fact when the wind pressure against them was only 11.2 pounds per square foot.

It was the testimony of plaintiff's chief witness, a consulting civil engineer, that the wind blew in the hangar doors and that the internal pressure of the wind, once inside, was such that it lifted the building off its foundation. This he attributed to the faulty building design and to improper anchorage of the walls' vertical studs. He said that the lifting of the building caused it to wrench, twist, and then disintegrate. He further testified that the building as constructed would fail when the speed of the wind against it reached 58 miles per hour. He claimed that a proper standard of good engineering practice in the area would have called for a building designed to resist wind pressures up to 81 miles per hour. This he determined by referring to the area's previously recorded high wind velocity of 61 miles per hour and then attaching to it an additional 20 miles per hour factor to allow for higher gusts.

A professional meteorologist, plaintiff's witness, testified that the 5:25 p.m. anemometer readings at the Portland International Airport, 3.4 miles east of the Vancouver Municipal Airport, indicated an east wind velocity of 14

miles per hour, with gusts to about 20 miles per hour. Four minutes later, the meteorologist said, the recorded wind speed jumped to approximately 59 miles per hour. It was at this point, plaintiff argues, that the hangar proved deficient and failed. It would not have been inadequate, he argues, if it had been properly constructed.

At the close of plaintiff's case, when his motion for non-suit was denied, defendant introduced testimony to the effect that the applicable code did not require doors on the structure involved, and that no violations of either the code or standards of good hangar construction had occurred.

Upon conclusion of all the evidence, defendant moved for a directed verdict. The motion was denied, the case submitted to the jury and a plaintiff's verdict was returned. This appeal followed.

Defendant first assigns error to the trial court's denial of its motion for a directed verdict and to the denial of its motion for a new trial or, in the alternative, for a judgment notwithstanding the verdict. It argues these assignments of error on the theory that an act of God caused the building to disintegrate. Defendant contends that it could not reasonably have foreseen that the building would be struck by such a violent windstorm and, therefore, any negligence which might have occurred could not be a legal, or proximate cause of plaintiff's injury.

We recently stated that foreseeability is not an element of proximate cause. *Rikstad v. Holmberg*, 76 Wn.2d 265, 456 P.2d 355 (1969). "Proximate cause" necessitates only a sufficiently close, actual, causal connection between the complained-of conduct and the resulting injury. The issue of causation in this case was properly submitted to the jury under the standard instruction (WPI 15.01) defining "proximate cause" in terms of "direct sequence" and making no reference to the issue of foreseeability.

While foreseeability is not appropriately considered as part of the causation issue, it is useful in determining the limits of the defendant's duty and the reasonableness of the defendant's conduct. In *Rikstad* we said (at 268) that if a plaintiff is to have his case submitted to the jury then he

must first produce substantial evidence to demonstrate that:

(1) there is a statutory or common-law rule that imposes a *duty* upon defendant to refrain from the complained-of conduct and that is designed to protect the plaintiff against harm of the general type; (2) the defendant's conduct violated the duty; and (3) there was a sufficiently close, actual, causal connection between defendant's conduct and the actual damage suffered by plaintiff.

Determination of the duty issue is not exclusively a function of the court. Here the court properly instructed the jury on the common-law rule that defendant, as a property owner, owed the plaintiff, as an invitee, the duty of exercising ordinary care. Generally, the duty to use ordinary care is bounded by the foreseeable range of danger. It is for the jury to decide whether a general field of danger should have been anticipated. *McLeod v. Grant County School Dist. 128,* 42 Wn.2d 316, 255 P.2d 360 (1953). In the instant case, the issue of whether the increased dangers inherent in such a violent windstorm were reasonably foreseeable was properly put before the jury by instruction No. 8, which read in part:

One who is under a duty to protect others against injury cannot escape liability for injuries to the person or property of such others on the ground that it was caused by an act of God, unless the natural phenomenon which caused the injury was so far outside the range of human experience that ordinary care did not require that is should be anticipated or provided against, and it is not sufficient that such phenomena are unusual or of rare occurrence.

The issue as to whether defendant's conduct violated the duty imposed by common law was properly presented to the jury with an instruction stating that an engineer or designer is guilty of negligence if he fails to apply the skill and learning which is required of similarly situated engineers or designers in his community.

In addition to the common law basis for negligence, the plaintiff also argues that defendant was guilty of negli-

gence per se because the hangar was neither designed nor constructed as required by the applicable building code in effect at the time of construction. The scope of the duty imposed by statutory rule is a matter of law. The duty extends only to persons in the class intended to be protected by the statute or ordinance, and only to those persons who suffer harm from a hazard which was intended to be prevented by compliance with the statute or ordinance. *Morgan v. State,* 71 Wn.2d 826, 430 P.2d 947 (1967); *Raffensperger v. Towne,* 59 Wn.2d 731, 370 P.2d 593 (1962).

■ Those provisions of the City of Vancouver building code which plaintiff alleges were violated in the construction of the hangar provided in part:

Sec. 2307. (a) General. Buildings and structures and every portion thereof shall be designed and constructed to resist the wind pressure as specified in this Section. All bracing systems both horizontal and vertical shall be designed and constructed to transfer the wind loads to the foundations.

(b) Wind Pressure. For purposes of design the wind pressure shall be taken upon the gross area of the vertical projection of buildings and structures at not less than 15 pounds per square foot for those portions of the building less than sixty feet (60′) above ground . . .

Defendant argues that the jury should not have been instructed as to those provisions because the provisions are intended only to protect persons injured by toppling or collapsing buildings and the plaintiff was not within this class of persons. We do not agree. We believe that the provisions were intended to protect all persons who might be injured by flying debris as a result of a building's failure to withstand wind pressures below the minimum resistance factor, regardless of whether the wind caused the building to collapse or to explode. Since the plaintiff produced expert testimony that the hangar did not satisfy those provisions and that this defect caused the building to explode, the trial court was correct in submitting those provisions and this theory of negligence to the jury. The jury was then left with the task of determining whether the defendant's conduct violated those provisions. Also, the jury was

asked whether the violation, if any, was a proximate cause of the injury, that is, whether there was a sufficiently close causal connection between the violation and the injury and whether the injury would not have occurred but for the violation.

The record indicates that plaintiff produced sufficient evidence to get instructions on both theories of negligence before the jury. The jury was properly instructed as to the law and there is ample evidence in the record to support the verdict of the jury. The judgment is affirmed.

HUNTER, C. J., WEAVER, ROSELLINI, HAMILTON, HALE, and NEILL, JJ., concur.

FINLEY, J. (concurring)—I concur fully in the majority opinion by McGovern, J. However, in view of some possible inconsistencies in our cases and some confusion indicated by the briefs in this and other appeals, I believe additional discussion of the concept of proximate cause and the concept of foreseeability may be in order and could be constructive.

Since *Palsgraf*[1] and the first Restatement of Torts[2] there has been much debate over what function the concept of foreseeability is to fill in the analysis of tort problems. Legal scholars have consistently preferred to consider foreseeability in terms of whether conduct creates an unreasonable risk of harm in prescribing or limiting legal duties, whereas the courts have been unclear and often have added confusion by persisting in discussing foreseeability as an element of proximate cause.

While the Restatement and the aforementioned prominent writers on legal theory are not everywhere in complete accord, they do appear to generally agree that the concept of "proximate cause" has been overworked, and that clarity of thought and more meaningful analysis are attainable where limitations upon liability other than the requirement that there be sufficient *actual causal connection* between the conduct and the injury are adminis-

---

[1] *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928).

[2] Restatement of Torts (1934).

tered as part of some issue other than "proximate cause," that, for example, it is conceptually confusing to regard "foreseeability" as an element of "proximate cause," and that questions with respect to foreseeability are more appropriately allocable to the issues of whether the defendant owed the plaintiff a duty and, if so, whether the defendant's conduct breached that duty.

(Italics mine. Footnote omitted.) Annot. 100 A.L.R.2d at 950 (1965).

To state the problem in terms of the elements of a cause of action for negligence, plaintiff's counsel . . . must be prepared to demonstrate that (1) there was a statutory or common-law rule which imposed a duty upon the defendant to refrain from the complained-of conduct and which was designed to protect the plaintiff against harm of the general type which he suffered, (2) the defendant's conduct violated the rule, and (3) there was a sufficiently close *actual causal connection* between defendant's conduct and actual damage suffered by plaintiff for the law to impose liability.

(Italics mine. Footnote omitted.) Annot. 100 A.L.R.2d at 997.

So confused had the area become that the first Restatement, at the instigation of Professor Jeremiah Smith, abandoned the term "proximate cause" in its entirety, and discussed "legal cause" instead. That Restatement also laid down the "substantial factor" test of legal causation in an effort to escape from the confusion which had been introduced into the "direct consequences" test for proximate cause by decisions which confused policy limitations on liability with causation, and discussed the resulting confusion in factual terms. But the confused analysis was difficult to destroy. *See* Annot. 100 A.L.R.2d at 986. It was necessary to revise the definition of the "substantial factor" test. In the 1948 Supplement to the Restatement, § 433 (substantial factor test of legal causation) was revised by moving consideration of whether the resulting harm was "highly extraordinary" from § 433 to § 435 (foreseeability of harm). The reason for the shift of emphasis as given by the Restatement is worth repeating:

It is completely faulty analysis . . . to list the "extraordinary" element as a part of the "substantial factor" aspect of legal cause particularly in view of § 442 which lists it as a part of the quite separate superseding cause problem. *It is confusing the question of policy with the question of fact.*

(Italics mine.) Restatement of Torts § 433 (Supp. 1948).

As carried into the Restatement (Second), the problem was discussed as follows in a comment to § 435:

Analytically, the highly extraordinary nature of the result which has followed from the actor's conduct (with or without the aid of an intervening force) indicates that the hazard which brought about or assisted in bringing about that result was not among the hazards with respect to which the conduct was negligent. . . . *Strictly, the problem before the court is one of determining whether the duty imposed on the actor was designed to protect the one harmed from the risk of harm from the hazard in question.* . . . However, courts frequently treat such problems as problems of causation.

(Italics mine.) *Comment* (c), Restatement (Second) of Torts § 435 (1965).

The circumstance that the courts have often treated such problems with an improper analysis is not solely of academic interest to scholars. Perceptive courts and practicing attorneys have discovered that a proper analysis leads to greater clarity of thinking and to more reasonably appropriate application of precedent. Appellant directs us to a dictum in *Eckerson v. Ford's Prairie School Dist. 11,* 3 Wn.2d 475, 101 P.2d 345 (1940), which is quoted verbatim in *Guerin v. Thompson,* 53 Wn.2d 515, 335 P.2d 36 (1959), in an attempt to distinguish between actual [but for] and legal [proximate] causation. The dictum is nothing but a very general statement that not all actual causes result in legal liability. Yet appellant would treat this dictum as establishing foreseeability as a part of the causation issue. However, scholarly opinion as well as previous opinions of this court clearly establish that it is a part of the duty issue. *See, e.g., Rose v. Nevitt,* 56 Wn.2d 882, 355 P.2d 776 (1960); *Rikstad v. Holmberg,* 76 Wn.2d 265, 456 P.2d 355 (1969).

A possible explanation of this recurring difficulty may be some loose language in the Eckerson opinion relating to "foreseeability." A close reading of that case will establish that the court was discussing "foreseeability" as a jury question and that the case cited in Eckerson, Leach. v. School Dist. 322, 197 Wash. 384, 85 P.2d 666 (1938), turned to an analysis of the duty of carriers and policy considerations as to the reasonableness of the risk.

In the instant case, as the majority opinion of McGovern, J., so ably points out, duty was predicated upon two theories—the common law duty of the landowner to the invitee and the statutory duty imposed by the building code. Both of these theories involve policy questions, in one case developed through thousands of cases involving land owner liability and in the other that policy enunciated by the legislative body. In most accident cases duty does not become a primary issue. However, in this case, the question of duty and the underlying policy considerations cannot merely be assumed but must be subjected to critical analysis.

The second step in this duty analysis is to determine whether plaintiff is one of a class which is to be accorded protection by the existence of the duty. This may involve the jury in the determination of foreseeability. Within the jury question of ordinary care is almost inevitably the question of whether a general danger to this class of individuals was reasonably to be anticipated by defendant.

It is a false analysis to ask, as appellant would have us: Was plaintiff's injury the foreseeable result of defendant's negligence? That question too easily allows confusion between improbable chains of causation and improbable creation of risk. The purpose of "risk theory," encapsuled in Cardozo's Palsgraf dictum, "[t]he risk reasonably to be perceived defines the duty to be obeyed," is to cause creation of unduly hazardous situations to produce legal liability for resulting injury. It is not designed to allow persons otherwise liable to escape liability because a foreseeable risk caused harm in an improbable manner. The preferable

application of "foreseeability" in the instant case is to discuss not the improbable facts, but the unreasonableness of the risk. The use of a proximate cause analysis places emphasis in the wrong place—on the improbable flying plywood rather than on the unreasonableness of the risk created by defendant's error in design or construction.

The better analysis is embodied in the question: Did the alleged negligence—a breach of either statutory or common law duty—create an unreasonable risk of harm to persons in the plaintiff's situation, *i.e.*, those persons standing in the area into which windblown debris could in fact be expected to fall?

There was clearly evidence in the record in the instant case to support a jury finding that the wind velocity was foreseeable. It cannot be denied that the plaintiff was *in fact* in a zone into which windblown debris could be expected to fall. Could the jury find that there was an unreasonable risk of harm? The hangar was made of plywood—a material which would blow for some distance in a strong wind. A sheet of plywood has a large sail area. The sheets were, indeed, likely to do just what they did do—fly up into the air as the wind entered the hangar after the doors failed. They then sailed on a 60 mile per hour wind. If the plywood had simply dropped with that lateral velocity, it could have moved from the hangar to the plaintiff in 3 seconds. It would have had to have been only 144 feet up to drop directly to the ground in 3 seconds. Since the plywood did have sail area, blew up into the air when it came loose, and was atop a roof to start with, I do not find it would require unusual foresight to predict this accident if one asked: If the hangar blew apart in a windstorm, what would happen?

Since the jury could find that the danger to this class of individuals was foreseeable in fact, the court must then determine whether there is any consideration of policy which might require a limitation of legal liability. The policy questions inherent in the establishment of a duty and in the possible limitation of legal liability must be the pri-

mary focus of an appellate court when duty questions are involved.[3]

Appellant, by focusing on the bizarre nature of the accident, avoids the question of reasonable anticipation of risk as well as the policy questions which must also be faced.[4] Appellant dwells colorfully upon the violence of the storm. This virtually ignores the evidence that the hangar failed *under foreseeable wind velocities.*

This is not a rule of unlimited liability, for wind velocities so extraordinary as not to be reasonably anticipated would not result in liability—for unreasonable risk of harm in relation to faulty design would not be created under such circumstances. There would therefore be no duty to

---

[3]*See Raymond v. Paradise Unified School Dist.,* 218 Cal. App. 2d 1, 31 Cal. Rptr. 847 (Dist. Ct. App. (1963)), for a discussion of these

various and sometimes delicate policy judgments. The social utility of the activity out of which the injury arises, compared with the risks involved in its conduct; the kind of person with whom the actor is dealing; the workability of a rule of care, especially in terms of the parties' relative ability to adopt practical means of preventing injury; the relative ability of the parties to bear the financial burden of injury and the availability of means by which the loss may be shifted or spread; the body of statutes and judicial precedents which color the parties' relationship; the prophylactic effect of a rule of liability; in the case of a public agency defendant, the extent of its powers, the role imposed upon it by law and the limitations imposed upon it by budget; and finally, the moral imperatives which judges share with their fellow citizens—such are the factors which play a role in the determination of duty.

[4]The limitations of this approach are discussed by Professors Harper and James in this manner:

As many cases put it, a new and unforeseeable force breaks the causal chain. A better analysis is to regard the intervening force as a risk or hazard and to ask whether its foreseeability was such as to make defendant's act negligent with regard to it. It is better, in other words, to inquire whether defendant's duty extends to such a risk as the intervening force, because the question in this form focuses attention on a more significant and less fictitious problem than that of cause.[32]

[32]The gain is in greater clarity of reasoning and formulation of the issues on which judgment should be passed. Neither one analysis nor the other is a substitute for the exercise of judgment upon the ultimate policy questions involved.

II F. Harper & F. James, Torts § 20.5 at 1142-43 (1956).

anticipate a genuine "act of God" type storm. This would be true regardless of whether the negligence—the breach of duty—was based on (1) failure to apply the skill and learning which is required of similarly situated designers in his community, or (2) negligence per se because of a violation of building codes. Of course, when there was no breach of duty, when the building codes are not violated and when the building is designed to withstand reasonably anticipated wind, there would also be no liability.

This leaves the question of causation. I think it incontestable that plaintiff's injury—a leg broken by flying debris when a structure collapsed 250 feet away during winds of gale force—was caused by "a natural and continuous sequence, unbroken by any new, independent cause, [which] produces the event, and without which that event would not have occurred." *Eckerson v. Ford's Prairie School Dist. 11,* 3 Wn.2d 475, 101 P.2d 345. Such a cause is a proximate cause. *See comment,* WPI 15.01. It is a misuse of foreseeability to place emphasis on the improbable nature of the accident. Denial of proximate cause in this situation would amount to a denial that physical events proceed in accordance with known laws of physics, mathematics, and engineering science.

Appellant confuses questions of fact with questions of policy. In the future, appellants attacking a jury determination in favor of plaintiffs will find that they have a greater chance of success by forthrightly confronting the policy questions inherent in the question of the legal duty owed to the plaintiff. We are not disposed to become a superjury in negligence cases and retry questions of factual probability. I am especially unsympathetic to disturbing the verdict of a jury upon grounds which cannot withstand analysis and which are in conflict with our own cases and with the weight of scholarly opinion.

WEAVER, J. (concurring)—I have signed the majority opinion, but I also agree with Finley, J.