[No. 64244-8-I.   Division One.   November 22, 2010.]

JAMES H. JACKSON ET AL., *Appellants*, v. THE CITY OF SEATTLE, *Defendant*, TRENCHLESS CONSTRUCTION SERVICES, LLC, ET AL., *Respondents*.

649

*Larry L. Setchell* and *Benjamin T. Shih* (of *Helsell Fetterman LLP*), for appellant.

*Shellie McGaughey* (of *McGaughey Bridges Dunlap PLLC*), for respondent Trenchless Construction Services LLC.

*Kathleen M. Boyle* (of *Themis Litigation Group*), for respondent QPS Inc.

¶1 BECKER, J. — The trial court granted summary judgment dismissal of a homeowner's negligence claims against two construction contractors whose allegedly negligent installation of a waterline for the previous owner caused a landslide, damaging the landscaping and house. We reverse. This is not a negligent construction case where the economic loss rule would apply and recovery would be

limited to contract remedies. The contractors are liable in tort if their negligence caused the landslide.

¶2 "We affirm orders granting summary judgment only when satisfied, after considering the facts in the light most favorable to the nonmoving party, that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Burg v. Shannon & Wilson, Inc.*, 110 Wn. App. 798, 803-04, 43 P.3d 526 (2002).

¶3 The appellant homeowners are James Jackson and his wife, C.R. Hendrick (collectively Jackson). They bought their house from Corrine Otakie and moved in in November 2006. Earlier that year, Otakie had a problem with a leaking waterline. She contacted respondent QPS Inc., a plumbing company. After investigating, QPS determined that fixing the old line would be too dangerous because it came down a steep hillside. QPS recommended installing a new waterline using the trenchless method. Otakie took the advice. She contracted with respondent Trenchless Construction Services LLC to drill and install the new waterline. She contracted with QPS to connect one end of the line to her house and the other end to the city water main at the top of the hill above her house, and to backfill any excavations.

¶4 Starting near the city water main above Otakie, Trenchless drilled a tunnel 5 inches in diameter and 160 feet long, at an acute angle down the hill to her house. The drilled line began on city property and crossed at least one private lot that did not belong to Otakie. Trenchless installed a one and one quarter inch pipe for the length of the line. QPS dug a trench, 30 feet long and 5 feet deep, along the top of the hill above Otakie's house from the water main to the start of the waterline Trenchless installed. QPS backfilled the connection trench. QPS then connected the pipe to the house, completing the installation in March 2006.

¶5 In November 2006, a large sinkhole formed at the top of the hill above the house—now owned and occupied by Jackson—near the water main where QPS had dug and backfilled the connection trench. The sinkhole was reported

by a local homeowner and backfilled by the city. The sinkhole reformed in early December, but it was not reported or filled again.

¶6 In December 2006, heavy rains fell on Seattle. On December 14, a city catch basin clogged and water began to pool in the sinkhole. The pooling water burst from the sinkhole, scouring a path down the hill to Jackson's property. The scour path, 15 feet wide by 4 to 5 feet deep, roughly followed the waterline drilled by Trenchless, causing the hillside above Jackson to slide down. The landslide caused considerable damage to the landscaping and house.

¶7 Jackson sued the city of Seattle, Trenchless, and QPS. He sued Seattle for negligently inspecting and backfilling the first November sinkhole and for allowing the catch basin to fail. Jackson voluntarily dismissed all claims against Seattle after they reached a mediated settlement.

¶8 Trenchless and QPS each moved for summary judgment dismissal. In opposition to the motions, Jackson filed declarations by engineers who opined that the construction by Trenchless and QPS caused the landslide and that it would not have happened if QPS had properly compacted the soil when it backfilled the 30 foot water main connection trench at the top of the hill, or if Trenchless had used a better medium to stabilize the downhill tunnel it bored for the 160 foot long pipe, or if Trenchless and QPS had properly planned and coordinated their project with each other and with the city.

¶9 The trial court granted the motions for summary judgment, orally ruling the contractors owed no duty to Jackson. Jackson appeals.

¶10 To show actionable negligence, a plaintiff must establish (1) the existence of a duty owed to the complaining party, (2) a breach of that duty, (3) a resulting injury, and (4) that the claimed breach was the proximate cause of the injury. *Burg*, 110 Wn. App. at 804. Duty in a negligence action is a threshold question. A duty may be predicated "on violation of statute or of common law principles of negli-

gence." *Burg*, 110 Wn. App. at 804. Jackson offers both a city ordinance and the common law as predicates for a duty owed by contractors. He relies on *Wells v. City of Vancouver*, 77 Wn.2d 800, 467 P.2d 292 (1970). In *Wells*, a hangar at the municipal airport blew apart in a fierce storm. The plaintiff's leg was broken when he was hit by a flying piece of plywood. According to the experts who testified for the plaintiff, the construction of the hangar fell short of the wind resistance standards in the city building code. The trial court allowed the plaintiff's case to go to the jury on the theory that a violation of the wind resistance standards breached a duty arising from the building code and also on the common law theory of a breach of a property owner's duty to an invitee. The Supreme Court affirmed.

¶11 The plaintiff has the burden of establishing the existence of a duty. *Burg*, 110 Wn. App. at 804. Jackson first contends the contractors breached a duty created by the Seattle stormwater code, analogous to the building code violations that were held to breach a statutory duty in *Wells*.

¶12 "In deciding when violation of a statute or administrative regulation shall be considered in determining liability, this court has relied upon the Restatement (Second) of Torts § 286 (1965)." *Melville v. State*, 115 Wn.2d 34, 36-37, 793 P.2d 952 (1990). Section 286 gives a four factor test:

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
>
> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the kind of harm which has resulted, and
>
> (d) to protect that interest against the particular hazard from which the harm results.

RESTATEMENT (SECOND) OF TORTS § 286.

¶13 The version of the stormwater code in effect at the time the contractors began their work set forth requirements for erosion control "for all land disturbing activities." Former SEATTLE MUNICIPAL CODE (SMC) 22.802.015 (2000). Compliance required the use of construction controls to achieve the following objectives:

> b. Before the completion of the project, permanently stabilize all exposed soils that have been disturbed during construction. Methods such as permanent seeding, planting, and sodding may be specified by rules promulgated by the Director.

> c. Prevent the transport of sediment from the site. Appropriate use of methods such as, but not limited to, vegetated buffer strips, stormdrain inlet protection, silt fences, sediment traps, settling ponds, and protective berms may be specified in rules promulgated by the Director.

Former SMC 22.802.015(C)(3). The code authorized certain city agencies to investigate and initiate enforcement action against parties responsible for code violations. Former SMC 22.808.030 (1996). An enforcement action could be initiated either through the office of the hearing examiner or in court, potentially leading to an order for corrective action or monetary penalties. Former SMC 22.808.040 (1996). The code also included a section on "Violations," making noncompliance with the code a "civil violation" and designating more egregious activities, such as noncompliance with orders, as "criminal violations." Former SMC 22.808.090 (1993). Creating a dangerous condition was specifically designated as a civil violation:

> Dangerous Condition. It is a violation of this subtitle to allow to exist, or cause or contribute to, a condition of a drainage control facility, or condition related to grading, stormwater, drainage or erosion that is likely to endanger the public health, safety or welfare, the environment, or public or private property.

Former SMC 22.808.090(A)(5). Jackson contends these provisions of the code demonstrate that its purposes satisfy the *Restatement* four-part test.

¶14 The difficulty for Jackson is the lack of language expressing a purpose to protect a particular class of persons. Building codes and other similar municipal codes do not typically serve as a basis for tort liability because they are enacted merely for purposes of public safety or for the general welfare. *Halvorson v. Dahl*, 89 Wn.2d 673, 677, 574 P.2d 1190 (1978). *Halvorson* was an exception to the traditional rule because it involved a housing code with a declaration of purpose that specifically mentioned a concern for the welfare of the "occupants" of buildings, not just the welfare of the public as a whole. *Halvorson*, 89 Wn.2d at 677. Seattle's stormwater code, on the other hand, comes within the traditional rule. It declares that one of its remedial purposes is protection of "life, property and the environment" from erosion, flooding, landslides, and other hazards. Former SMC 22.800.020(A)(1) (2000). Almost identical language was discussed in *Halvorson* to show how the purpose of a typical building code is to protect the general public rather than a particular class of individuals. *Halvorson*, 89 Wn.2d at 677 n.2. While the court in *Wells* did approve a duty instruction based on the city building code, the parties in that case apparently assumed the wind resistance standards were designed with a purpose to protect a particular class. The issue presented was whether the particular class was limited to persons directly injured by a collapsing building. In deciding that the protected class was broad enough to include anyone injured by flying debris, the court did not address the precise issue presented in this case—whether the code was intended to protect a particular class of persons rather than the general public.

¶15 Not only does the Seattle stormwater code employ the general purpose language of a typical building code, it also contains language specifically disavowing an intention to protect a particular class of persons. The code specifically states, "It is expressly the purpose of this subtitle to provide for and promote the health, safety and welfare of the general public. This subtitle is not intended to create or

otherwise establish or designate any particular class or group of persons who will or should be especially protected or benefitted by its terms." Former SMC 22.800.020(B). In the subsection on penalties and damages that can be awarded by the hearing examiner or by a judge, the subtitle "does not establish a cause of action that may be asserted by any party other than the City. Penalties, damages, costs and expenses may be recovered only by the City." Former SMC 22.808.060(C) (1993).

■ ¶16  When a court decides that a violation of a statute shall be considered in determining liability for negligence, the motivation for doing so is to give effect to the will of the legislature:

> It is not every provision of a criminal statute or ordinance which will be adopted by the court, in a civil action for negligence, as the standard of conduct of a reasonable person. Otherwise stated, there are statutes which are considered to create no duty of conduct toward the plaintiff, and to afford no basis for the creation of such a duty by the court. The courts in such cases have been careful not to exceed the purpose which they attribute to the legislature. This judicial self-restraint is rooted in part in the theory of the separation of powers.

W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 36, at 222 (5th ed. 1984) (footnote omitted). Jackson does not persuasively explain how we could view the stormwater code as a foundation for a negligence action in spite of the express disclaimer of a purpose to designate a protected class and the express terms making the code enforceable only by the city. We conclude he has not established the existence of a duty arising from the code.

■ ¶17  This does not mean Jackson is without a remedy. Even if a violation of the city stormwater code is not negligence, this case does resemble *Wells* in that the facts support a common law theory of liability. We agree with Jackson that the contractors owed him the common law duty of care recognized in *Davis v. Baugh Industrial Contractors, Inc.*, 159 Wn.2d 413, 417, 150 P.3d 545 (2007).

¶18 In *Davis*, the crew foreman of a concrete company was accidentally crushed to death by falling cement blocks while he was inspecting leaking water pipes. A contractor had installed the pipes, allegedly without using reasonable care. The trial court granted summary judgment to the contractor on the ground that the common law completion and acceptance doctrine relieved the contractor of liability for negligence after the work was completed by the contractor and accepted by the landlord. Abandoning the "ancient" doctrine of completion and acceptance, the court instead employed *Restatement (Second) of Torts* § 385 (1965):

Persons Creating Artificial Conditions on Land on Behalf of Possessor: Physical Harm Caused After Work has been Accepted

One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to liability to others upon or outside of the land for physical harm caused to them by the dangerous character of the structure or condition after his work has been accepted by the possessor, under the same rules as those determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others.

Under this section of the *Restatement*, "a builder or construction contractor is liable for injury or damage to a third person as a result of negligent work, even after completion and acceptance of that work, when it was reasonably foreseeable that a third person would be injured due to that negligence." *Davis*, 159 Wn.2d at 417.

¶19 This statement in *Davis* defines the duty that Trenchless and QPS owed to Jackson when they installed the waterline. Viewed in the light most favorable to Jackson, the evidence establishes that the installation of the waterline created a dangerous condition on the hillside land above the residence. The land had previously been designated as a potential landslide area by the city of Seattle, and it was reasonably foreseeable that drilling and connecting the new waterline would cause damage to third persons if done without sufficient attention to compacting the dis-

turbed soil or stabilizing the newly bored waterline. *See Schneider v. Strifert*, 77 Wn. App. 58, 63, 888 P.2d 1244 (1995) ("Foreseeability is a question of fact for the jury unless reasonable persons could reach but one conclusion.").

¶20 Trenchless and QPS argue that *Davis* is factually distinguishable. In *Davis*, the negligently installed water pipes leaked, whereas in this case the new waterline remained intact and functioned as promised. And in *Davis*, the negligence caused bodily injury, whereas in this case there was only property damage. But these are not material distinctions. They do not override the policy concerns that motivated our Supreme Court to cast aside the completion and acceptance doctrine:

> The doctrine is also harmful because it weakens the deterrent effect of tort law on negligent builders. By insulating contractors from liability, the completion and acceptance doctrine increases the public's exposure to injuries caused by negligent design and construction of improvements to real property and undermines the deterrent effect of tort law. Illinois long ago abandoned the doctrine specifically for this reason, stating that "[a]n underlying purpose of tort law is to provide for public safety through deterrence of negligent designers and builders. This purpose cannot be accomplished if these persons are insulated from liability simply by the act of delivery." *Johnson v. Equip. Specialists, Inc.*, 58 Ill. App. 3d 133, 373 N.E.2d 837, 843, 15 Ill. Dec. 491 (1978).

*Davis*, 159 Wn.2d at 419-20. Similarly here, the deterrent effect of tort law on negligent construction would be diminished by absolving contractors of tort liability so long as they deliver a functional system and do not cause bodily injury. Contractors who install a waterline on a steep slope have to be concerned about the condition in which they leave the slope, not just the condition of the waterline. And liability imposed under *Restatement* § 385 is "for physical harm"; this includes damage to property, not just personal injury.

¶21 Trenchless and QPS insist that the economic loss rule bars Jackson's negligence action. "The eco-

nomic loss rule marks the fundamental boundary between the law of contracts, which is designed to enforce expectations created by agreement, and the law of torts, which is designed to protect citizens and their property by imposing a duty of reasonable care on others." *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 821, 881 P.2d 986 (1994). "If the economic loss rule applies, the party will be held to contract remedies, regardless of how the plaintiff characterizes the claims." *Alejandre v. Bull*, 159 Wn.2d 674, 683, 153 P.3d 864 (2007).

¶22 In a case involving a claim of negligent misrepresentation by homebuyers against an appraiser hired by their lender, this court stated that it is error to apply the economic loss rule where no contractual relationship exists between the parties. *Borish v. Russell*, 155 Wn. App. 892, 901, 904, 230 P.3d 646 (2010). Citing *Borish*, Jackson contends the economic loss rule has no application in this case because he did not have a contract with Trenchless or with QPS.

¶23 The idea that there must be privity between the parties before the economic loss rule comes into play would seem to be at odds with the leading case of *Berschauer/Phillips*. In that case, the court made the economic loss rule the foundation of its decision to deny a tort remedy to a general contractor even though the damages, costly delays in the construction of a school project, were allegedly caused by negligent preparation of architectural plans and negligent inspection of the work by individuals with whom the contractor did not have a direct contractual relationship. The court denied the contractor's tort claims because the damages caused by the construction delays were only economic losses. Notwithstanding *Borish*, we conclude it is appropriate to consider the economic loss rule here, even though Trenchless and QPS did not directly contract with Jackson.

¶24 Based on the economic loss rule, Trenchless and QPS argue that any duty they had to install the waterline safely arose solely by means of their contracts with Otakie

and accordingly Jackson must be limited to a contract remedy. We disagree. As discussed above, a duty in tort to use due care in installing the waterline arose from the common law.

¶25 The contractors contend Jackson's claim is precluded by *Stuart v. Coldwell Banker Commercial Group, Inc.*, 109 Wn.2d 406, 745 P.2d 1284 (1987). In *Stuart*, a condominium homeowners' association, suing on behalf of original and subsequent unit purchasers, attempted to impose tort liability upon the builder and vendor of the units for construction defects that resulted in rotting and impairment of the units. *Stuart*, 109 Wn.2d at 422. Applying the economic loss rule, the court refused to recognize a tort cause of action for negligent construction. Beyond the terms expressed in the contract of sale, "the only recognized duty owing from a builder-vendor of a newly completed residence to its first purchaser is that embodied in the implied warranty of habitability." *Stuart*, 109 Wn.2d at 417. *Stuart* does not stand for the proposition that a building contractor can be sued only for contract remedies. The court was concerned with preventing the consumer from using a tort theory to obtain compensation for a defective "product" (the condominium) that did not meet the consumer's market-based economic expectations. The court was careful to preserve tort liability for physical damage caused when the "product" does not meet a standard of safety defined in terms of conditions that create unreasonable risks of harm. *Stuart*, 109 Wn.2d at 419 (quoting *Seely v. White Motor Co.*, 63 Cal. 2d 9, 403 P.2d 145, 45 Cal. Rptr. 17 (1965)).

¶26 Under *Stuart*, Jackson's loss was not an "economic" loss. An economic loss is a defect of quality as evidenced by internal deterioration. But when a loss stems "from defects that cause accidents involving violence or collision with external objects," that is a physical injury susceptible of a tort remedy. *Stuart*, 109 Wn.2d at 420.[1] If the new waterline

---

[1] *See also Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 241 P.3d 1256 (2010); *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 170 Wn.2d 442, 243

had not functioned properly and had to be reinstalled or fixed, that would be an economic loss. But the waterline itself worked as anticipated. Jackson's loss was damage to his house and landscaping, caused by the violent occurrence of the landslide—an event allegedly precipitated by the defective condition in which the contractors left the hillside.

¶27 In short, we agree with the distinction stated in *Stieneke v. Russi*, 145 Wn. App. 544, 556, 190 P.3d 60 (2008), *review denied*, 165 Wn.2d 1026 (2009): "[W]hen a defective product injures something other than itself, such as a person or other separate property, the loss is not merely an economic loss and tort remedies are appropriate." The same is true of a defective installation of a product. The nature of Jackson's loss is injury to property resulting from the allegedly negligent installation of an otherwise functional waterline. Because Jackson establishes that Trenchless and QPS owed him a duty of care under *Davis*, the trial court erred in treating his case as if it were a claim for negligent construction precluded by *Stuart*.

¶28 In addition to arguing lack of duty, QPS contends the dismissal can be affirmed on the alternative ground of lack of proximate cause. This argument was not properly raised below and we will not consider it. *White v. Kent Med. Ctr., Inc.*, 61 Wn. App. 163, 168-69, 810 P.2d 4 (1991).

¶29 The record shows genuine issues of material fact remain concerning breach of duty. Summary judgment was inappropriate.

¶30 Reversed.

GROSSE and SCHINDLER, JJ., concur.

---

P.3d 521 (2010). These two decisions, issued after oral argument in this case and cited by Jackson as supplemental authority, confirm our decision and our rationale.