IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| AMELIA BESOLA, individually and as Personal Representative of THE ESTATE OF MARK BESOLA, <br><br> Appellant, <br><br> v. <br><br> STEPHANIE BLOOMFIELD; ANDREA MCNEELY; LISA KREMER; GORDON THOMAS HONEWELL, LLP, a Washington Limited Liability Partnership; and JOHN/JANE DOEs 1-10, current and/or former employees and/or agents of GORDON THMOAS HONEYWELL, LLP, identity currently unknown, <br><br> Respondents, <br><br> MICHAEL SMITH, <br><br> Defendant. | No. 86651-6-I <br><br><br><br><br><br> UNPUBLISHED OPINION |

BOWMAN, A.C.J. — Amelia Besola, individually and as personal representative (PR) of Mark Besola's estate (Estate), appeals the trial court's order dismissing her legal malpractice, negligence, and breach of fiduciary duty claims against Gordon Thomas Honeywell LLP and several of its employees (collectively GTH). GTH represented Eric Pula, the Estate's predecessor PR. Amelia[1] argues the trial court erred by dismissing her lawsuit because GTH

---

[1] We refer to Amelia Besola and Mark Besola by their first names for purposes of clarity and mean no disrespect by doing so.

breached its duty to the Estate and its heirs by failing to prevent Pula from misappropriating Estate assets.  Because GTH had no duty of care to the Estate or its heirs, we affirm the trial court's dismissal.  And because Amelia's appeal is not frivolous, we deny GTH's request for appellate fees and costs.

FACTS

On January 1, 2019, Mark died.  Around January 3, his sister Amelia presented a will that Mark had executed in 2013 (2013 Will) to the Pierce County Superior Court for probate.  The court accepted the 2013 Will and appointed Amelia as PR of the Estate.

On May 8, 2019, Pula, Mark's former roommate, filed another will, purportedly signed by Mark on December 6, 2018 (2018 Will).  The 2018 Will designated Pula as the PR and primary beneficiary of the Estate, expressly disinherited Amelia, and named Mark and Amelia's sister, Julia Besola-Robinson, as a beneficiary.[2]  On September 26, 2019, a court commissioner admitted the 2018 Will to probate, revoked Amelia's letters testamentary, and appointed Pula as PR of the Estate.  Pula then hired GTH to assist him with probate proceedings.

On October 18, 2019, Amelia moved to revise the commissioner's order, alleging Pula forged the 2018 Will.  The court denied Amelia's motion[3] but

---

[2] *See In re Est. of Besola*, No. 56775-0-II, slip op. at 1-2 (Wash. Ct. App. Mar. 21, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2056775-0-II%20Unpublished%20Opinion.pdf (opinion arising from Besola-Robinson's appeal from the trial court's decision to reduce her attorney fee award following the November 2021 bench trial on Amelia's Trust and Estate Dispute Resolution Act (TEDRA), chapter 11.96A RCW, petition).

[3] The court denied the motion without prejudice subject to a will contest.

2

ordered Pula to post a $250,000 bond "after the turnover of [the] Estate." On October 25, 2019, Amelia petitioned under TEDRA, contesting the validity of the 2018 Will.

On January 8, 2020, Pula moved the court for an order "granting alternate security in lieu of a [PR]'s bond." On Pula's behalf, GTH argued Pula "has worked diligently to seek a bond in the amount of $250,000, but has not been able to do so." GTH proposed alternative security options, including allowing Pula to

> [s]erve with nonintervention powers and without bond, using liquid assets of the [E]state to pay for [E]state expenses, but direct him to report any sale of real property to the Court and have any such proceeds deposited into a blocked account. The [PR] then could petition the court for permission to remove amounts from the blocked account as needed for expenses of administration.

Amelia opposed the motion, asking the court to either impose full intervention authority or appoint a third-party administrator.

On January 17, 2020, the court granted Pula's motion for alternate security. It ordered Pula to "serve with nonintervention powers and without bond" but required him "to report any sale of real property to the Court and have any such proceeds deposited into a blocked account." Then, Pula must "petition the court for permission to remove amounts from the blocked account as needed for expenses of administration." On March 6, GTH attorney Lisa Kremer spoke with a KeyBank manager about Pula opening an account that "would need to be blocked for holding proceeds from real estate sales."

On August 7, 2020, the court granted Pula's motion to sell Estate real property located in Hoquiam. It ordered that the proceeds "be held in a blocked

account." When Pula later executed the closing documents for the sale at GTH's office, GTH did not notice that the deposit slip directed escrow to deposit the proceeds into the "PR's unblocked account." Around August 31, the sale of the Hoquiam property closed. GTH instructed Pula to set up a blocked account to deposit the sale proceeds into. But on September 1, per Pula's instructions, the title company deposited the sale proceeds into the unblocked account.

On September 11, 2020, the title company informed GTH attorney Stephanie Bloomfield that escrow deposited the sale proceeds into an unblocked account ending in 4961. Bloomfield's paralegal, Sincere Hankins, contacted Pula, who said he instructed the KeyBank branch manager to transfer the funds into a separate blocked account. Hankins then confirmed that the bank moved the funds into a separate account ending in 1272. GTH incorrectly believed that account 1272 was a blocked account.

On October 21, 2020, Pula moved for the court's approval to sell two more Estate real properties, one in Bonney Lake and the other on Lake Tapps. Later that month, GTH learned that account 1272 was not blocked. Kremer contacted KeyBank and "requested the account holding the funds be blocked immediately." On October 27, the branch manager explained that KeyBank could not block the existing account but could "quickly open a new account that was blocked." Kremer then drafted a blocking agreement and sent it to the manager with a copy of the court's order. The manager said he would send the paperwork to the legal department for review.

On October 30, 2020, the court granted Pula's motion to approve the sale of the Bonney Lake and Lake Tapps properties. On November 9, KeyBank told Kremer that it could not open a blocked account but suggested that she contact "Key Private Bank," which she did "immediately." On November 18, Key Private Bank said it "would definitely be able to open a blocked account."

On November 20, 2020, Pula, through GTH, moved for the court's approval to sell an Estate real property in Raymond. Then, on November 22, Key Private Bank sent Kremer a fee schedule and explained that it "was uncomfortable opening the blocked account because the cost of supervision was steep." Kremer "urged [Key Private Bank] to continue setting up the account."

Three days later on November 23, Pula, through GTH, moved the court to

> issue an order authorizing the PR to make the following payments from the Estate's blocked account: (1) a $5,000 fee to the PR; (2) full payment to GTH for the PR's attorneys' fees ($538,295) and the costs and expenses advanced by the firm ($30,23[9]); and (3) . . . payment of state estate taxes (estimated at $375,000).

On December 3, 2020, Key Private Bank told Kremer it "hoped to have documents to open the account within the next few days." But it also told her that the Estate's primary account had only $17.60 remaining and account 1272 had been emptied and overdrawn by $1,800.00. The same day, GTH notified the court that "[o]ver $185,000[.00] has been removed from the Estate's Key[ ]Bank accounts beginning in mid-October." And it moved to deposit the funds from the sale of the Bonney Lake property into the court's registry.

The next day, December 4, GTH filed a notice of intent to withdraw as counsel for Pula. The same day, the court removed Pula as PR of the Estate,

revoked letters testamentary, and appointed attorney Michael Smith as the emergency successor PR. GTH then filed a notice of appearance on behalf of Smith. Besola-Robinson moved to disqualify GTH from representing Smith, arguing it had "ongoing . . . and irreconcilable conflicts of interest" related to its representation of Pula. After a hearing, the court disqualified GTH from representing Smith in both the probate of the Estate and the TEDRA action. Smith moved for reconsideration, which the court denied.

On November 17, 2021, after a bench trial on Amelia's TEDRA petition, the court entered findings of fact and conclusions of law in favor of Amelia. It found by clear, cogent, and convincing evidence that the 2018 Will was invalid because it was "not signed by Mark Besola or anyone else at his direction and . . . is the product of fraudulent conduct." On November 30, the court admitted Mark's 2013 Will to probate and re-appointed Amelia as PR of the Estate.

On December 22, 2023, Amelia, as both an heir and PR of the Estate, sued GTH for legal malpractice, negligence, and breach of fiduciary duty, alleging its conduct caused damage to the Estate.[4] On March 22, 2024, GTH and its employees moved to dismiss Amelia's lawsuit under CR 12(b)(6), arguing the claims were untimely and GTH owed no duty to the Estate or its heirs. On May 2, the court dismissed Amelia's claims against GTH with prejudice. It reasoned there was a "lack of any duty running from GTH to [the Estate or its heirs]" and that "the statute of limitations expired before this matter was filed."

---

[4] In April 2024, Amelia amended her complaint to add claims against Smith for negligence and breach of fiduciary duty. But in May, she moved to voluntarily dismiss her claims against Smith without prejudice under CR 41(a)(1). The court granted her motion.

6

Amelia appeals.

ANALYSIS

Amelia argues the trial court erred by dismissing her claims against GTH.[5] GTH argues it owed no duty to the Estate or its heirs and requests attorney fees and costs on appeal.

1.  CR 12(b)(6) Dismissal

We review de novo an order granting a motion to dismiss under CR 12(b)(6).  *Jackson v. Quality Loan Serv. Corp.*, 186 Wn. App. 838, 843, 347 P.3d 487 (2015).  Dismissal under CR 12(b)(6) is appropriate when "the plaintiff cannot prove any set of facts consistent with the complaint that would entitle the plaintiff to relief."  *Id.*  We presume all facts alleged in the complaint are true but need not accept its legal conclusions.  *Id.*  And we may consider hypothetical facts supporting the plaintiff's claim.  *FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.*, 180 Wn.2d 954, 962, 331 P.3d 29 (2014).  If a plaintiff's claim remains legally insufficient even under their hypothetical facts, dismissal is appropriate under CR 12(b)(6).  *Jackson*, 186 Wn. App. at 843-44.

Generally, only an attorney's client may sue that attorney for legal malpractice.  *In re Guardianship of Karan*, 110 Wn. App. 76, 81, 38 P.3d 396 (2002).  But in some cases, "an attorney may owe a nonclient a duty even in the

---

[5] Amelia also identifies the order dismissing her claims against Smith in her notice of appeal.  But Amelia moved to voluntarily dismiss that claim.  And she neither assigns error to the court's dismissal nor makes any argument about it in her opening brief.  As a result, Amelia has abandoned her appeal of that order.  *See* RAP 10.3(a)(4), (6).

absence of this privity." *Id.* For a nonclient plaintiff to establish a claim for legal malpractice, they must prove

> (1) the existence of an attorney-client relationship which gives rise to a duty of care to the plaintiff, (2) an act or omission by the attorney in breach of the duty of care, (3) damage to the plaintiff, and (4) proximate causation between the attorney's breach of duty and the damage incurred.

*Trask v. Butler*, 123 Wn.2d 835, 839-40, 872 P.2d 1080 (1994). The threshold question in a negligence action is whether a duty exists. *Jackson v. City of Seattle*, 158 Wn. App. 647, 651, 244 P.3d 425 (2010). The plaintiff has the burden of establishing a duty. *Id.* at 652.

To determine whether an attorney owes a duty to a nonclient, we apply a multifactor balancing test and consider the following elements:

> (1) [T]he extent to which the transaction was intended to benefit the plaintiff;
> (2) the foreseeability of harm to the plaintiff;
> (3) the degree of certainty that the plaintiff suffered injury;
> (4) the closeness of the connection between the defendant's conduct and the injury;
> (5) the policy of preventing future harm; and
> (6) the extent to which the profession would be unduly burdened by a finding of liability.

*Trask*, 123 Wn.2d at 842-43. We apply the balancing test on a case-by-case basis, evaluating each case on its own facts. *See Karan*, 110 Wn. App. at 83. We give substantial weight to the question of "whether the plaintiff is an intended beneficiary of the transaction." *See Trask*, 123 Wn.2d at 843. If the plaintiff is not an intended beneficiary, the attorney owes the plaintiff no duty, and our inquiry ends. *Id.*

8

A nonclient plaintiff alleging a lawyer owed them a duty must show they were more than "an incidental beneficiary of the transaction." *See Strait v. Kennedy*, 103 Wn. App. 626, 631, 13 P.3d 671 (2000). Some "alignment" between a client's and nonclient's interests is insufficient to "show that the attorney or client *intended* the [nonclient] to benefit from the attorney's representation." *Stewart Title Guar. Co. v. Sterling Sav. Bank*, 178 Wn.2d 561, 567, 311 P.3d 1 (2013).

In *Trask*, our Supreme Court applied the multifactor balancing test to determine whether a PR's attorney owed a duty to the estate or its heirs. 123 Wn.2d at 839-45. In that case, a successor PR and heir sued the previous PR's attorney for legal malpractice, alleging the attorney negligently advised the previous PR to engage in conduct that depleted estate assets. *Id.* at 838-39. The court concluded that the attorney owed no duty to the estate or its heirs. *Id.* at 845. It reasoned that the attorney's advice was intended to benefit the previous PR, not the estate or its heirs. *Id.* And that any benefit to the estate and its heirs was only incidental. *Id.* The court added that the estate and its heirs already have an avenue for relief—suing the PR for breach of fiduciary duty. *Id.* And it noted that to hold otherwise would create an unresolvable conflict of interest for estate attorneys "in deciding whether to represent the [PR], the estate, or the estate heirs." *Id.*

We reached the same conclusion in *Benjamin v. Singleton*, 7 Wn. App. 2d 527, 436 P.3d 389 (2019). There, a PR, through their attorney, obtained a court order authorizing the sale of estate real property. *Id.* at 529. The PR sold the

property and placed the proceeds in an unblocked bank account. *Id.* The PR ignored the court's order to distribute the proceeds to estate beneficiaries and spent over $110,000 of the proceeds for his personal use. *Id.* The successor PR sued the previous PR's attorney for legal malpractice and breach of fiduciary duty for, among other things, failing to require the PR to post a bond and failing to ensure that estate proceeds were placed in a blocked account. *Id.* at 529-30. Citing *Trask*, we concluded the attorney owed no duty to the estate or the heirs. *Id.* at 532-33. We reasoned that the successor PR did not show the estate was an intended beneficiary of the attorney's services, the estate and its heirs had an alternative path to relief by suing the PR for breach of fiduciary duty, and imposing such a duty on the attorney would interfere with their duty of loyalty to the PR. *Id.* at 531-34.

In contrast, in *Williams*, we determined that a PR's attorneys owed a duty of care to the decedent's estate and its nonclient surviving children. *In re Est. of Williams*, noted at 153 Wn. App. 1047, 2009 WL 5092865, at *7-*8. In that case, a PR hired a law firm to bring a wrongful death action against the decedent's doctor " 'on behalf of the Estate and on behalf of [the decedent's] surviving children, pursuant to RCW 11.28 et seq.' " *Id.* at *1.[6] The parties settled the lawsuit and the PR misappropriated the settlement funds. *Id.* The successor PR sued the original PR's lawyers for malpractice. *Id.* We concluded that under those facts, the PR's attorneys owed a duty to the estate and the surviving children. *Id.* at *7-*8. We reasoned that a wrongful death action vests in the PR

---

[6] Emphasis omitted.

" 'only in a nominal capacity' " because the action is " 'asserted in favor of the . . . beneficiaries.' " *Id.* at \*7 (quoting *Gray v. Goodson*, 61 Wn.2d 319, 326, 378 P.2d 413 (1963)). So, "in the wrongful death context, the statutory beneficiaries are intended, not merely incidental, beneficiaries of the attorney-[PR] relationship." *Id.*

This case is more like *Trask* and *Benjamin* than *Williams*. Pula hired GTH to advise him as to his role as PR, not to pursue a wrongful death action on behalf of the Estate and its heirs. Indeed, GTH acted in that capacity when it advocated for Pula to post alternate security to maintain his role as PR. Those services were meant to benefit Pula, and any resulting benefit to the Estate was only incidental. Also, like the plaintiffs in *Trask* and *Benjamin*, the Estate and its heirs had an alternative path to relief—suing Pula for breach of fiduciary duty.[7] And, as *Trask* and *Benjamin* recognized, imposing a duty here would unreasonably burden GTH by interfering with its legal and ethical obligations to Pula.

Still, Amelia argues that *Trask* and *Benjamin* are different because the PRs there "were never required to comply with the statutory bond requirement or any alternative security."[8] And here, she asserts GTH "obtained an order that *did*

---

[7] Citing *Karan*, Amelia argues the Estate and its heirs have no meaningful recourse if Pula is " 'judgment proof.' " 110 Wn. App at 85. But whether Amelia could recover on a judgment is a different issue from whether a viable cause of action exists.

[8] Amelia contends that because the purpose of an alternative bond is to protect estate assets, GTH's motion for alternate security on Pula's behalf aligned Pula's and the Estate's interests. But it was the trial court's duty, not GTH's, to ensure that an adequate bond protected Estate assets. And an "alignment of interests" alone does not make the Estate an intended beneficiary of legal services. *See Stewart Title*, 178 Wn.2d at 567.

require Pula to comply with the bond requirement." But the court's order applied to Pula, not GTH. Amelia fails to explain how the order imposed a separate duty on GTH to ensure that Pula deposited Estate proceeds into a blocked account.[9]

Amelia also argues that *Karan* controls here. In *Karan*, a child's mother hired an attorney to help her set up a guardianship to protect funds left to the child by the child's deceased father. 110 Wn. App. at 78-79. The attorney petitioned on behalf of the mother for guardianship of the child's estate. *Id.* at 79. The court granted the petition but failed to order that the funds be placed in a blocked account. *Id.* The child's mother then spent most of the funds. *Id.* The court held that the successor guardian had standing to sue the attorney on behalf of the ward because the attorney's services were intended to benefit the ward. *Id.* at 84-86. But, as we recognized in *Benjamin*, those facts are distinguishable from cases like this one, which does not involve a legally incompetent ward or an attorney's obligation to establish a guardianship and preserve a ward's property. 7 Wn. App. 2d at 532; *Karan*, 110 Wn. App. at 84-85.

Because GTH had no duty to the Estate or its heirs, the trial court did not err by dismissing Amelia's causes of action under CR 12(b)(6).[10]

---

[9] Amelia suggests that GTH "undertook a duty" to create a blocked account, "which [it] intended to directly benefit the Estate and its beneficiaries." She argues GTH took on this duty "by representing to the probate court that Pula would deposit proceeds from Estate real property sales into a blocked account." But the record shows no affirmation by GTH that it would deposit Estate proceeds into a blocked account or ensure that Pula would do so.

[10] Because we conclude that GTH had no duty of care to the Estate or its heirs, we need not address GTH's argument that Amelia's lawsuit was untimely.

2. <u>GTH Attorney Fees and Costs</u>

GTH requests attorney fees and costs on appeal under RAP 18.9(a). Under RAP 18.9(a), we may order a party who files a frivolous appeal to pay fees. "[A]n appeal is frivolous if it raises no debatable issues on which reasonable minds might differ and it is so totally devoid of merit that no reasonable possibility of reversal exists." *Protect the Peninsula's Future v. City of Port Angeles*, 175 Wn. App. 201, 220, 304 P.3d 914 (2013). Because Amelia's appeal from the trial court's CR 12(b)(6) dismissal of her lawsuit raised a debatable issue and was not totally devoid of merit, we deny GTH's request.

We affirm the trial court's dismissal and deny GTH's request for attorney fees and costs.

_____, ACJ

WE CONCUR:

_____          _____
Coburn, J.                       Mann, J.